500 P.2d 830

Frank B. COOKE and Doris E. Cooke, husband and wife, Plaintiffs-Respondents,

v.

Harvey C. IVERSON et al., Defendants-Appellants.

No. 10860.

Supreme Court of Idaho.

July 17, 1972.

Rehearing Denied Sept. 15, 1972.

**930**

Randall C. Fredricks, of Clemons, Cosho, Humphrey & Samuelsen, Boise, for defendants-appellants.

Bert L. Poole, of Roberts, Poole & Robson, Boise, for plaintiffs-respondents.

SHEPARD, Justice.

Plaintiffs-Respondents Cooke entered into an agreement for the sale of their Camas Prairie ranch property with defendants-appellants Mull as purchasers and defendant-appellant Iverson as real estate agent. The Cookes brought an action against defendants-appellants alleging misrepresentation in the consideration to be received by the Cookes. The District Court found in favor of the Cookes and entered judgment awarding damages. The Mulls also claimed misrepresentation on the part of the Cookes and sought damages therefor. The District Court found in favor of the Cookes and entered judgment denying relief to the Mulls. Defendants Mulls and Iverson have appealed from both portions of that judgment. We affirm the judgment of the trial court in all parts.

We consider first the less complicated portion of this appeal which involves the claim of Defendants Mull that Plaintiffs Cooke had misrepresented the Cookes' ranch property which resulted in pecuniary damage to the Mulls. The Mulls claimed that the Cookes had misrepresented the amount of water on the ranch and also the extent of infestation of weeds on that property. The District Court found against the Mulls in both regards and discussed at length the various reasons why such contentions were not supported by the evidence. We find it necessary only to point out that the Mulls failed to introduce any proof of damages resulting from the alleged misrepresentations, assuming that they were in fact made by the Cookes. In an action or claim for monetary damages occasioned by fraud a showing of actual pecuniary damage must be made. Nab v. Hills, 92 Idaho 877, 452 P.2d 981 (1969). Defendants Mull principally claimed that they had sustained damages resulting from an over abundance of weeds such as morning-glory, upon the ranch in question. The evidence indicated that weeds such as morning-glory are prevalent in the Camas Prairie area wherein the ranch is located. No evidence indicated that the amount of weeds on the ranch in question was more than normal for a ranch in the Camas Prairie area. It was further shown the Defendants Mull had knowledge of farming in the Camas Prairie region and were experienced farmers. Defendants attempted to introduce an exhibit purporting to show certain damages from such weeds. That exhibit was, however, only partially admitted and such portion as was admitted showed only that a certain amount of weed killer was administered on the property during certain years. There was no showing that such weeds as did exist caused any damage to the defendants, nor was there any showing on the part of the defendants that they had the right to rely on such statements as plaintiffs may have made. Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559 (1962); King v. H. J. McNeel Inc., 94 Idaho 444, 489 P.2d 1324

(1971). In any event such showing as was made by the defendants Mull was not "clear and convincing" proof as is required for the establishment of fraud. Gillingham v. Stadler, 93 Idaho 874, 477 P.2d 497 (1970); C. I. T. Corporation v. Hess, 88 Idaho 1, 395 P.2d 471 (1964).

We now turn to the more complex portion of this appeal wherein it is contended that the District Court erred in finding that there was clear and convincing evidence of material misrepresentations by the defendants Mull. This portion of the appeal involves consideration of four parcels of land above and beyond the Camas Prairie property heretofore discussed. Those additional properties are denominated as:

1. "Lots 5, 6, 7" located in Lincoln County.

2. The "Dry 80" also located in Lincoln County and being contiguous to "Lots 5, 6, 7."

3. "The 220" also located in Lincoln County.

4. The "Twin Falls lot" being lot 21 of the Yeatman Addition to Twin Falls County.

In 1963 plaintiffs Cooke contacted the defendant Iverson, a real estate agent broker, and listed their Camas Prairie ranch for sale through him. The Cookes agreed to pay Iverson a commission of $2,500 for the sale of their ranch. Subsequently a contract was entered into by the Cookes and the Mulls for the sale of the Camas Prairie Ranch for $50,000. The Cookes agreed that if the Mulls sold "Lots 5, 6, 7" and "The Dry 80" and received at least one-fifth of the sale price of those properties in cash, the plaintiffs Cooke would accept up to $10,000 of the paper received by the Mulls on those sales and apply said paper against amounts remaining due on the Cookes' Camas Prairie ranch.

It is now necessary to review the method by which the Mulls had acquired "Lots 5, 6, 7" and the "Dry 80." In 1962 one Albert Smith had purchased "The 220" and "Lots 5, 6 and 7" from one Molly Nab. He also purchased the "Dry 80" from one Preston Page. Nab retained a contract interest in the "220" and "Lots 5, 6, 7" and Page retained a contract interest in the "Dry 80."

In 1963 Albert Smith contracted to sell "Lots 5, 6, 7" and the "Dry 80" to the defendants Mull and as a part of the payment therefor the Mulls were to pay off Smith's remaining obligation on "The 220" to the end that Smith would gain clear title to "The 220." Defendant Iverson was the real estate broker for that transaction.

Following the execution of the principal agreement in question herein for the purchase and sale of plaintiffs' Camas Prairie ranch, the defendants Mulls, again with Iverson as real estate broker, executed a sales agreement for the sale of "Lots 5, 6, 7" and the "Dry 80" to one Helen Garrison. Helen Garrison was the sister of Mrs. Mull and had been previously married to Mr. Mull's brother. As consideration for that sale Helen Garrison purportedly paid the Mulls $2,035 in cash, a note for $3,000 and certain "pasturage" credits of the value of $1,400 on a total purchase price of $25,000. Helen Garrison was in fact a married woman during all the time in question but signed all papers and deeds during the time in question as a single woman.

Within a short period of time after the sale between the Mulls and Mrs. Garrison, Mrs. Garrison in turn sold the same property to one Duwayne Helsley for his personal $10,000 note and an equity of the value of $2,700 in the "Twin Falls lot." Mrs. Garrison, in turn then quitclaimed the "Twin Falls lot" to the Mulls in return for the personal note that she had executed to the Mulls.

The Mulls thereafter contacted the plaintiffs Cookes and represented to them that they had received more than one-fifth of the purchase price of "Lots 5, 6, 7" and the "Dry 80," in cash. The Cookes thereafter reduced the Mull sale obligation on the Camas Prairie ranch by $10,000 in exchange for paper resulting from the Mull-Garrison sale.

In July of 1964 the negotiations and agreements became even more complex and circuitous. Defendant Iverson contacted Cookes and secured from them authority to change the security right of the Cookes in the Mull-Garrison contract to a mortgage arrangement. Apparently the Cookes understood that the mortgage would secure a personal note executed by Mrs. Garrison. However, in the execution of that agreement Iverson substituted instead the note from Helsley. Iverson also contends that he secured similar authority to change from a contract of sale agreement to a mortgage situation on the other properties. He thereupon secured execution of a mortgage upon the "Dry 80" in exchange for release of the vendor's interest in the sale agreement of "The 220." Page's vendor's interest in the "Dry 80" was paid off. Albert Smith thereby obtained and secured a clear deed to "The 220." As a result of these transactions the plaintiffs-respondents herein, Cookes, found themselves with only the Helsley note as security backed by a third mortgage on these properties, such third mortgage being junior to the mortgages held by Molly Nab and the Federal Land Bank.

Helsley, the then purchaser of "Lots 5, 6, 7" and the "Dry 80," defaulted without ever having made a payment and Molly Nab foreclosed her mortgage on "Lots 5, 6, 7" and the "Dry 80." Such properties were sold at sheriff's sale. In its findings the trial court found the value of that land to be between $12,000 and $14,000. The trial court further found that Helsley's $10,000 promissory note was valueless.

■ Defendants-appellants contend that the trial court erred in finding that there was clear and convincing evidence that the following misrepresentations were made by defendants-appellants to-wit:

A. That "Lots 5, 6, 7" and the "Dry 80" were "owned" by the Mulls;

B. That an assignment of the contract of sale on "Lots 5, 6, 7" and the "Dry 80" would be "good security" for the Cookes;

C. That "Lots 5, 6, 7" and the "Dry 80" had sold three times recently for $25,000;

D. That the only indebtedness or encumbrances against "Lots 5, 6, 7" and the "Dry 80" was the Federal Land Bank mortgage in the approximate amount of $1,000.

We note initially:

"It has long been the rule of this Court that where there is sufficient substantial and competent evidence to support the findings of the trial court and such findings are not clearly against the weight of the evidence, the findings are binding on the Supreme Court and will not be disturbed on appeal. [Citations] The trial judge is the arbiter of conflicting evidence and his determination of the weight, credibility, inferences and implications thereof is not to be supplanted by this Court's impressions or conclusions from the written record. [Citations] This is so because the trial court has a better opportunity to judge this matter because of seeing and noting the demeanor of the witnesses." Brammer v. Brammer, 93 Idaho 671, 471 P.2d 58 (1970); Reardon v. Union Pacific Railroad, 93 Idaho 833, 475 P.2d 370 (1970).

Plaintiffs testified that the above representations had been made and on the other hand defendants testified that such representations had not been made. There is a direct conflict in the evidence and such conflict was for the resolution of the district court. Brammer v. Brammer, *supra.* Defendants further contend that even if such representations were made they were not relied upon by the plaintiffs, that they did not have a right to rely on the representations and, that in any event, no damages resulted to plaintiffs from any such alleged representations. We think the record clear that the plaintiffs did rely on the representations and that they were entitled to do so because the truth or falsity of the representations was within the special knowledge of Iverson. The Cookes had no reason to distrust the assertions of Iverson or the Mulls, particularly since

Iverson occupied a relationship of real estate broker. It is clear that the reliance of the Cookes upon the representations of the defendants resulted in damage to them since they traded $10,000 worth of equity in their Camas Prairie ranch for a worthless note. Insofar as Defendant Iverson is concerned, he participated in inducing the Cookes to enter into the contract and received a $2,500 commission from Cookes.

Defendants-appellants further contend that the finding of the trial court of the value of "Lots 5, 6, 7" and "Dry 80" as being $12,500 to $14,000 is not supported by the evidence. Those values were testified to by two witnesses, neither of which was a party to the action. Their values are supported by testimony in the record indicating generally shallow soil of the farm and the fact that the area in which the farm is located is one of the poorest farming districts in the Magic Valley area. Albeit those valuations were contradicted by witnesses for the defendants, nevertheless there was sufficient evidence to support the finding and it will not be overturned here since the finding is not clearly against the weight of the evidence. Brammer v. Brammer, *supra*. This finding further supports the determination that a false and material representation was made that the properties had sold for $25,000. While one might be reluctant to accept $10,000 worth of paper on a farm worth only $12,500, the transaction would appear much more desirable if the farm were worth $25,000.

It is further clear that the number of senior encumbrances on the properties was highly material. If the value of the land was as found by the District Court to be only $12,500 and a prior large mortgage existed thereon, the security for plaintiffs' paper would be non-existent.

It is clear that Iverson as the real estate agent had knowledge of the above facts and should have disclosed them to the plaintiffs. To do otherwise would subject him to a loss of compensation for such agency. 8 Am.Jur., Brokers, § 142; 3 C.

J.S. Agency § 182; Restatement, Agency 2d §§ 387, 401, 469. As was said in Reese v. Harper, 8 Utah 2d 119, 329 P.2d 410 (1958):

"But the relationship of real estate agent and client makes the situation quite different. The agent is issued a license and permitted to hold himself out to the public as qualified by training and experience to render a specialized service in the field of real estate transactions. There rests upon him the responsibility of honestly and fairly representing the interests of those who engage his services * * *. Accordingly, persons who entrust their business to such agents are entitled to repose some degree of confidence that they will be loyal to such trust and that they will, with reasonable diligence and in good faith, represent the interests of their clients. Unless the law demands this standard, instead of being the badge of competence and integrity it is supposed to be, the license would serve only as a foil to lure the unsuspecting public in to be duped by people more skilled and experienced in such affairs than are they, when they would be better off taking care of such business for themselves."

The court further stated:

"Because of the specialized service the real estate broker offers in acting as an agent for his client there arises a fiduciary relationship between them; it is incumbent upon him to apply his abilities and knowledge to the advantage of the man he serves; and to make full disclosure of all facts which his principal should know in transacting the business. Failure to discharge such duty with reasonable diligence and care precludes his recovery for the service he purports to be rendering. * * *

" 'It was his duty to inform his principal of all facts which might influence his principal in accepting or rejecting the offer. An agent is not entitled to recover until he has fully performed this duty * * *.' "

*See also*: Prall v. Gooden, 226 Or. 554, 360 P.2d 759 (1961); Ridgeway v. McGuire, 176 Or. 428, 158 P.2d 893 (1945).

 The evidence in the record before us sustains the finding that Iverson failed to reveal to plaintiffs a number of facts which "might influence his principal in accepting or rejecting the offer." While we need not deal with the contention that Iverson actively misrepresented vital facts for the apparent reason of obtaining a real estate commission, nevertheless it is clear that Iverson failed to act properly in his relationship to the plaintiffs and that the trial court was correct in denying Iverson a commission on the sale. Reese v. Harper, *supra*; Prall v. Gooden, *supra*. Again, the evidence upon the withholding or misrepresentation of information by Iverson is controverted and conflicting. The district court is the arbiter of that conflict. Brammer v. Brammer, *supra*.

Defendants-appellants next contend that the trial court erred in finding that the Helsley note was worthless. They contend that the note is worth $10,000 and plaintiffs therefore have shown no damage. We note that Helsley made not a single payment on the real estate contract and that following the foreclosure thereon by Molly Nab, that note was completely unsecured. Defendants introduced no evidence to show any value in that note. We note further that plaintiffs are upon receipt of the judgment herein to deliver the Helsley note to the Mulls. Therefore should the contention of the defendants be correct at some time in the future and the note be found to have value, they will benefit therefrom and be made whole.

Defendants-appellants next assign error in the finding of the District Court that the substitution of the mortgage for the Nab-Smith contract and the substitution of the "Dry 80" for "The 220" all were done without authority. Defendant-appellant Iverson attempted to explain his authority for making such substitutions but that explanation was inconsistent and improbable and rightfully rejected by the District Court. Also the record supports the finding of the trial court that the substitution of the Helsley note in place of paper from Mrs. Garrison was not intended by the plaintiffs and was not in their interests. Such substitution was to the detriment of the plaintiffs and resulted in proximate damage to them.

 Defendant-appellant Iverson next asserts that his relationship of fiduciary to the plaintiffs ended upon the completion of the original contract of sale between plaintiffs and defendant Mull in 1963. It is clear, however, that Iverson's function was to act as plaintiffs' agent during the course of the entire transaction on behalf of plaintiffs and his own testimony indicates that he was so purporting to act as agent of the Cookes. Those actions led plaintiffs to believe that such relationship existed and it is clear that they reposed their trust and faith in that relationship. Stearns v. Williams, 72 Idaho 276, 240 P.2d 833 (1952).

 We further note that the plaintiffs were led to believe that more than one-fifth of the purchase price for the sale of the "Dry 80" and "Lots 5, 6, 7" had been in cash. The record is clear that such was not the case. Since the proper amount of cash down-payment had not been received by the Mulls, plaintiffs Cooke were not bound to take the paper from the Mull-Garrison sale. Plaintiffs Cooke relied upon the statements that the proper amount of cash down-payment had been received and otherwise would not have accepted the worthless Helsley note. The ultimate effect of the trial court's judgment was to place the parties in status quo by cancelling the $10,000 credit upon the purchase price of the Camas Prairie ranch of the Cookes and return to the Mulls paper representing the same amount of money.

To untangle this web of complex transactions brought about by asserted misrepresentations and unauthorized acts is perhaps impossible. The record is replete with highly conflicting and hotly controverted evidence. Nevertheless the evidence in the

record supports the findings of the trial court that representations were made by the defendants, that the representations were false, that the representations were material, that defendants knew the representations to be false or did not know them to be true, that defendants intended the plaintiffs to act on the representations and that the plaintiffs actually thereafter acted, that plaintiffs did not know that the representations were false and relied thereon, that the plaintiffs had a right to rely thereon and that the plaintiffs were injured by such reliance. All the essential elements of fraud were thus shown in the record and support the findings of the trial court. Gillingham v. Stadler, *supra*; Walker v. Nunnenkamp, *supra*.

The judgment of the trial court is *affirmed*. Costs to respondents.

McQUADE, C. J., and McFADDEN, DONALDSON, and BAKES, JJ., concur.