616 P.2d 245

**REXBURG REALTY, INC., an Idaho Corporation, Plaintiff-Respondent,**

v.

**Dean COMPTON and Carol B. Compton, husband and wife, Defendants-Appellants.**

No. 13085.

Supreme Court of Idaho.

Aug. 12, 1980.

Herman E. Bedke of Nielson & Bedke, Burley, for defendants-appellants.

J. Kent Jolley, Rexburg, for plaintiff-respondent.

BAKES, Justice.

Defendant appellants Dean and Carol Compton, husband and wife, appeal from a district court judgment awarding a real estate broker commission to plaintiff respondent Rexburg Realty, Inc. We affirm.

The Comptons owned approximately 2,000 acres of farmland in Cassia County and were also tenants in common with Mr. Compton's mother, Rita Bateman, in approximately 2,000 acres which adjoined the Compton land. These two parcels, totaling 3,947 acres, were farmed by the Comptons as a single unit.

In 1973 the Comptons discussed with neighbors the idea of selling both parcels of land. Hearing of the Comptons' interest in selling their land, an agent for plaintiff respondent Rexburg Realty, Inc., contacted the Comptons, and the Comptons subsequently entered a written real estate broker's employment contract authorizing Rexburg Realty to attempt to find a buyer for the entire 3,947 acres. The agreement specified that the Comptons would accept $555,-740 for the property, with a 29% down payment. Both Mr. and Mrs. Compton signed the standard form real estate commission contract, agreeing to pay Rexburg Realty, Inc., 5% of the agreed sale price if it obtained a buyer ready, willing and able to purchase the property on the sellers' terms. Mrs. Bateman, however, did not sign the commission agreement. The real estate agent was aware that Mrs. Bateman had an

interest in part of the property and, in fact, had examined the record title to the property in order to obtain a legal description of the entire farm prior to execution of the contract by the Comptons. Dallin Reese, agent for Rexburg Realty, Inc., testified at trial that Compton had assured him that Mrs. Bateman wanted her interest in the land sold, that she usually followed her son Dean Compton's advice in such matters, and that Compton believed there would be no problem in obtaining her signature to close a sale on the terms in the broker's agreement. Defendant Dean Compton's testimony generally concurred with Reese's testimony.

Rexburg Realty subsequently obtained an offer of $550,000 with a down payment of $11,000 from Lyle Robison and James Christiansen. The Comptons agreed to the modification of the terms specified in the broker's agreement and signed the earnest money agreement. However, sale of the property to Robison and Christiansen never was consummated because Mrs. Bateman decided she would not sell her share in the property and would not sign the earnest money agreement. The prospective buyers sued the Comptons for specific performance and were denied the relief requested in district court. The court's denial of specific performance was affirmed on appeal. *Robison v. Compton*, 97 Idaho 615, 549 P.2d 274 (1976).

Rexburg Realty, Inc., demanded its commission from the Comptons for its procuring ready and willing buyers for the property despite failure of the sale to Robison and Christiansen to close. Upon the Comptons' refusal to pay the commission, the realtor initiated this action, alleging that it had fully performed its employment agreement by obtaining an acceptable offer from Robison and Christiansen and that it was there-

fore entitled to its commission. The district court, hearing the case without a jury, awarded the plaintiff realtor $27,500, *i. e.*, the 5% contract commission as applied to the $550,000 sale price specified in the parties' earnest money agreement.[1]

The Comptons bring this appeal from the district court judgment. They contend that a real estate broker's commission agreement which is not signed by all of the owners of the property involved is not enforceable. They argue that I.C. § 9–508[2] requires that *all* co-owners of real estate sign a real estate broker's employment contract before that agreement is enforceable by a realtor and maintain that here the broker's failure to obtain the signature of Mrs. Bateman on the commission agreement bars enforcement of the agreement against the Comptons.

Pursuant to I.C. § 9–508 an enforceable real estate commission contract must be in writing and "signed by the owner of such real estate, or his legal, appointed and duly qualified representative." I.C. § 9–508 is a form of statute of frauds applicable to a real estate broker employment agreement.

"The primary purpose of I.C. § 9–508 is to prevent fraudulent or unfounded claims of brokers. This particular portion of our code relates entirely to statutes of frauds and has as its objective avoiding disputes as to whether or not an agreement in fact exists, the amount of a commission and the exclusive or non-exclusive terms of a listing agreement." *C. Forsman Real Estate Co., Inc. v. Hatch*, 97 Idaho 511, 515, 547 P.2d 1116, 1120 (1976).

In *Forsman* it was held that a real estate broker employment agreement was "a service contract not necessarily related to the ownership of land," 97 Idaho at 516, 547 P.2d at 1121, and that a brokerage agreement involving realty owned as community

1. No contention was made by plaintiff appellants that Mrs. Bateman was liable for any part of the commission, she of course never having contracted with the plaintiffs for the procuring of a buyer for the property.

2. "[I.C. §] 9–508. REAL ESTATE COMMISSION CONTRACTS TO BE IN WRITING.—No contract for the payment of any sum of money

or thing of value, as and for a commission or reward for the finding or procuring by one person of a purchaser of real estate of another shall be valid unless the same shall be in writing, signed by the owner of such real estate, or his legal, appointed and duly qualified representative."

property need only be signed and executed by one spousal owner and is binding upon the signing spouse even absent the other spouse's signature or ratification of the agreement.

Subsequent to *Forsman*, this Court ruled in *Garfield v. Tindall*, 98 Idaho 841, 573 P.2d 966 (1978), that:

"[A] co-owner of property, who has expressly or impliedly represented to the broker that he can convey the property to be sold, cannot escape personal liability under a brokerage commission contract because it was not signed by the other co-owner(s)." 98 Idaho at 843, 573 P.2d at 968.

The district court in deciding the case at bar relied upon the *Forsman* and *Garfield* cases in concluding that the parties' agreement was enforceable against defendant appellants Dean and Carol Compton. The *Garfield* case specifically provides that where a co-owner of realty expressly or impliedly represents to a real estate broker that he has authority to sell property subject to the agreement, he will be liable to the broker for a sales commission upon performance of the agreement by the broker despite the failure of any other co-owner or co-owners to sign the agreement. Dallin Reese, realty agent for Rexburg Realty,

and Dean Compton both testified at trial that when Reese presented the real estate broker's employment agreement to the Comptons for their signatures, Compton told Reese that his mother, Mrs. Bateman, wanted the land sold, that she would co-operate with the Comptons in arranging a sale, and that she usually accepted Mr. Compton's advice in business matters and would go along with his advice in this transaction. The trial transcript indicates that the parties several times discussed Mrs. Bateman's interest in part of the property and that each time respondents were assured that she would agree to a transaction arranged by her son, Dean Compton.[3]

If the purpose of I.C. § 9–508 is, as stated in *Forsman*, to bar fraudulent or unfounded claims for a sales commission by real estate brokers, the purpose of that statute has been met here. The parties' agreement is in writing, the property adequately described, the amount of the commission and terms of the listing are specified, and the agreement has been signed by two of the co-owners with representations made to the broker by the signing co-owners that the contemplated transaction would be approved by the third co-owner. The record made at trial readily supports the trial court's memorandum decision which, relying on the *Gar-*

---

**3.** Dallin Reese testified on direct examination as follows:

"[W]e had talked about his mother and he had indicated to me that . . . she had been interested in having him sell the property for some time because of the fact that she was nervous about him traveling so much on the highway and having to be up and down the road doing so much work up there on the farm and not actually living right there on the farm, that she would prefer for him to sell, and I had asked him, as I recall, several times to indicate or if her signature was necessary, and he said, no, that he didn't think it would be because she had never been any problem and that she wanted him to sell and she would cooperate on the thing."

"He told us that she was at home, and we asked him if her signature was necessary or that if we should go over there, and he indicated and told us there was no problem, that the deal would be consummated under his signature and that the only time her signature would be necessary would be in the closing and transferring of the Deed."

Dean Compton testified similarly on direct examination:

"We talked about my mother's signature being on the Listing. I had asked him if he thought it was necessary for Mother's signature to be there, and he said, 'Well, I don't know,' and he says, 'What kind of relationship do you have with your mother,' and I said, 'Well, Mother usually goes along with what I want to do,' but I never assured him that she would in any way. I advised him if it was necessary to get her signature on it I'm sure we could, so he said, 'Well, I don't think it's necessary,' and so he said, 'Why don't you go get Carol's signature on it and bring it back,' and that is what we did.

"Q. Was anything said about, that you and Dallin talked about, whether your mother wanted to sell the place or expressed an intention to sell the place at any time?

"A. I don't recall. It seems like when I told him Mother usually went along, I said, 'It has been Mother's desire to sell the farm.'"

*field* case, concluded that Dean Compton at least impliedly, if not expressly, represented to Rexburg Realty that he was authorized to sell the property on behalf of his mother, Mrs. Bateman. For this reason we affirm the trial court's conclusion that the real estate broker's agreement in this case is valid and enforceable against the Comptons. *Marshall Bros., Inc. v. Geisler*, 99 Idaho 734, 588 P.2d 933 (1978); *Garfield v. Tindall, supra; Rogers v. Hendrix*, 92 Idaho 141, 438 P.2d 653 (1968).

The trial court's judgment is affirmed. Costs are awarded to respondent.

DONALDSON, C. J., and McFADDEN, J., concur.

BEEBE, Judge Pro Tem., dissenting:

I conceive that the decision of this Court in *Garfield v. Tindall*, 98 Idaho 841, 573 P.2d 966 (1978), and *C. Forsman Real Estate Co., Inc. v. Hatch*, 97 Idaho 511, 547 P.2d 1116 (1976), stand for the proposition that any person with an interest in property in which another has an interest may singly enter into a brokerage commission contract which, if in writing and signed by him, will satisfy the provisions of I.C. § 9–508. The rationale of those decisions is that such an agreement is one for personal services of the broker and not necessarily related to the ownership of the land. *Forsman*, a case involving community property directly so holds; in *Garfield* such holding is not that clearcut although it is arguable that such is the holding of the Court. In this interpretation of the statute, Justice McQuade in his dissenting opinion in *Forsman* stated, "[W]e invite brokers to accumulate promises from the unknowing when there is no real expectation that a sale will result." 97 Idaho at 518, 547 P.2d at 1123.

Real estate brokers are a licensed profession in the State of Idaho and a degree of expertise in property matters is required.

A broker, as a generality, has been said to occupy a fiduciary relationship with an owner contracting for his services.[1] Brokers customarily draw legal documents for execution by the owner they represent and a buyer they find in consummating their employment of finding a buyer ready, willing, and able to purchase. In the case at bar, the broker located buyers, prepared and caused to be executed by his contracting owners and such buyers an earnest money agreement, and thereafter delivered the same. The document constituted a final and relatively complicated real estate agreement.

The true protection for the unknowing when there is no real expectation a sale will result which concerned Justice McQuade lies not in the interpretation he would have urged of I.C. § 9–508, *i. e.*, to require thereunder that all persons having an interest in listed property join in the listing agreement with the broker; for even then a listing owner could decline to sell and frustrate the expectation of sale by the other listing owner. The protection lies in the other laws applicable. In this the law recognizes the obvious purpose of the owner who lists real estate for sale by the broker to be that a sale will result. As between the owner and the broker, so long as it is consistent with the broker's duties to the owner, the broker's interest is to earn a commission.

An owner who does not wholly own the property that is to be sold has a defect in his title. A broker, even though his contractual obligation is only to find a purchaser ready, willing and able to purchase the property, is not entitled to a commission when the sale is not consummated for failure of the owner to make good title if the broker knew of such defect in the title. It is also the law that if such broker with knowledge of the defect in the title has had the owner's express or implied representation that the owner can convey the property that is to be sold, the broker is entitled to

1. *Mallory v. Watt*, 100 Idaho 119, 594 P.2d 629 (1979); *Cooke v. Iverson*, 94 Idaho 929, 500 P.2d 830 (1972); *Giese v. Tarp*, 92 Idaho 243, 440 P.2d 521 (1968); *Rogers v. Hendrix*, 92 Idaho 141, 438 P.2d 653 (1968).

his commission.[2]  *See Garfield v. Tindall, supra.*

The employment contract between appellants and respondent is on an official employment contract form used by the Idaho Association of Realtors.  It provided appellants would pay respondent a commission of five percent for finding a buyer ready, willing and able to purchase the property at the price and on the terms listed, or other terms and price appellants may accept.

The earnest money agreement contained a selling price which was less than the price listed and other somewhat different terms.  As aforesaid, it constituted, with its numerous attachments, a complete and final agreement of sale and purchase of the property, and it was submitted to appellants for acceptance and execution and was finally delivered by the broker to the buyers.  The delivery resulted in a lawsuit between the buyers and the sellers when Mrs. Bateman, who owned an interest in some of the property and was not a contracting party, refused to convey.  *See Robison v. Compton,* 97 Idaho 615, 549 P.2d 274 (1976).

It was what occurred concerning the earnest money agreement that I consider crucial to this case;  not only because any commission under the brokerage contract would be payable only perforce acceptance by execution of the earnest money agreement since the price and terms differed from the listing price, but also because of the known title defect which was further discussed between appellants and respondent at that point.  In my opinion, the validity of the earnest money agreement was expressly conditioned upon execution thereof by Mrs. Bateman.

It is not disputed but what respondent knew that appellant Dean Compton's mother had an interest in the property at or near the time of the listing or shortly thereafter.  Discussions between appellants and respondent's agents were had.  The trial court's findings were:

> "Now the plaintiff knew from the outset that the mother had an interest in the property, but Dean Compton assured plaintiff there'd be no problems: 'She will go along with it;  she wants to sell,' or words to that effect."

The trial court expressly found agency was not an issue between appellants or either of them, and the mother of appellant Dean Compton.  The record is devoid of any evidence of actual authority.

The trial court concluded *Forsman* and *Garfield* controlled his decision—no specific conclusion otherwise.  The majority infers,

**2.**  12 Am.Jur.2d, Brokers, Sec. 201, reads as follows:

"In the absence of a stipulation to the contrary in the contract between the broker and his principal, it is the accepted general rule that the former is entitled to his commissions if, acting in good faith, he procures a purchaser willing, able, and ready to take the property upon the terms offered by the principal, although the contract is rescinded or the sale otherwise fails because of a defect in the principal's title, of which the broker had no notice.  Thus, where a person contracts with a broker to sell property which he does not own, his subsequent failure to perfect a title which will enable him to complete the sale does not affect his liability to the broker.  Likewise, a person who has employed a broker to sell his property cannot avoid liability for commissions on the ground that he is unable to complete the transaction because his spouse refuses to join in the contract of sale, or deed, where the broker has procured a customer ready, able, and willing to purchase the property.  And a broker has been held entitled to recover commissions from the seller notwithstanding the sale was not consummated and the broker returned the deposit to the purchaser, where the sale was not consummated for failure of the owner to make a good title.  The general rule has been held applicable to a broker employed to effect an exchange of property and to a broker employed to secure a loan.

The general rule rests upon the theory that the broker, in the absence of notice to the contrary, is entitled to act upon the assumption that the principal has a marketable title.  It has been held not to be the broker's duty to inquire as to the existence of a defect, and a fortiori, where an owner assures the broker that title is good or that he will obtain good title, the broker has a right to rely on the assurance.  The presumption that the principal has marketable title is not conclusive, however.  It may be waived by the acts of the parties, and where the facts are inconsistent therewith, it will not be implied."  (Footnotes omitted.)

from the trial court's reference to *Garfield*, the conclusion to have been as follows:

"That Dean Compton at least impliedly, if not expressly, represented to Rexburg Realty that he was authorized to sell the property on behalf of his mother, Mrs. Bateman." *Ante* at 247, 248.

I cannot agree that Dean Compton's statements that his mother would go along with the sale because she wanted to sell and usually went along with what he did, amounted to a representation that he was authorized to sell the property on behalf of his mother, or could be characterized in any manner as an "assurance," in its sense of certainty, that the property could be conveyed. *See Eastern Oklahoma Land & Cattle Co. v. Dorris*, 549 P.2d 78 (Okl. 1976). The trial court viewed the statements as an assurance to respondent "there'd be no problems" (with Mrs. Bateman) and likely concluded respondent was entitled to rely thereon, in effect, attributing to appellant a direction to respondent to "forget that problem; go find a buyer at the price and terms listed." The court concluded that whether or not a sale took place, appellants undertook potential liability for a commission.

The matter of Mrs. Bateman signing the earnest money agreement, (a rather innocuous name for this particularly complicated agreement of sale and purchase) was discussed at the time it was submitted for acceptance by appellants.

Respondent's agent, Ross Reese, testified on direct examination:

"Q. On that occasion, Mr. Reese, did Mr. Compton tell you that was a condition associated with the Earnest Money Agreement that had to be met before he would go through with it, namely, the signature of his mother?

A. On the occasion of the Earnest Money Agreement?

Q. That's correct.

A. Okay. At the time we obtained the Earnest Money Agreement, it was late in the evening. They had met us at the airport and picked us up, and they were very cordial people, and I became very attached to Mrs. Compton that evening. I'd better clarify that.

Q. Would you like to explain that since it's a part of the record?

A. I was impressed. They were very sincere and very nice people. I appreciated them very much. We visited considerably about the offer in attempting to make it satisfactory to them. I explained very carefully at that time that one of the parties that was purchasing was a very good friend of mine, and so I took special care to disclose the facts and make sure that everything in it was as they wanted it, and that was one of the reasons for the counteroffers is to clear up and clarify and clean up the offer as it was so it would not be any problem anywhere. The question when they did finally accept it and everything else, we did discuss their mother, and it was late at night, and I was under the impression and told by Mr. Compton that was not an issue and there would not be a problem on the thing. He did not discourage us for going over to see her. She lived at a nearby community, I couldn't tell you which one at this time, but it was not at any point indicated that this was going to be a problem, so we said all right. I don't like to get between families, and I didn't know what the arrangements were between he and his mother. I was informed previously that he had been running the farm, selling the crops, and operating as if he was in total control."

Respondent's agent, Dallin Reese, testified on direct examination:

"Q. Now, on that occasion was there any conversation between you and the Comptons, including your brother Ross Reese, concerning Mrs. Rita Bateman Compton, who you had discussed earlier, had a partial interest in some of the land?

A. Yes, we discussed it several times that evening, also as to what her position would be in the closing of the Real Estate Contract and the consummation of the sale.

Q. And do you remember the manner or nature in which that conversation

**472**

arose and the substance of that conversation?

A. As I recall, we asked specifically if the Comptons felt like that her signature was needed on the Purchase Agreement, and we were given the indication that—

MR. BEDKE: To which we object. He is testifying concerning her conclusion he was given an indication. I think the procedure is for him to relate to the best of his ability what was said, not his conclusion of what was said.

THE COURT: Yes. The objection will be sustained. We'll take our first morning recess at this time.

THE COURT: You may continue.

Q. Now, Mr. Reese, we are continuing with the direct examination that we were pursuing prior to the recess. Now, on that occasion when you and Ross Reese were meeting with Mr. and Mrs. Compton at their home in the evening time, as you testified, did Mr. Compton say anything about the requirement of his mother signing that Earnest Money Agreement?

A. No.

Q. Was it discussed?

A. Yes.

Q. Do you remember who discussed it?

A. Ross discussed it with Mr. Compton.

Q. And do you remember whether or not there was any agreement at that time to obtain the signature of Rita Compton Bateman?

MR. BEDKE: To which we object. That calls for a conclusion.

THE COURT: Yes, it does, I will have to sustain.

Q. Was the subject discussed as to whether or not Mrs. Bateman's signature should be on the Earnest Money Agreement?

A. Yes.

Q. And did you participate in that discussion?

A. Yes, some.

Q. And what was the nature of that discussion?

A. Well, the nature of the discussion was that we were assured that she would be no problem.

Q. And who gave you this assurance?

A. Mr. Compton.

MR. BEDKE: To which we object. It calls for a conclusion or paraphrasing of the conversation, and I feel that the procedure is that he relate his best recollection what was said and the conclusion would have to be drawn by the Court.

THE COURT: I think that would be proper.

Q. Do you recall what was said, Mr. Reese?

A. Yes, it was discussed and, as we mentioned, the subject of Rita B. Compton was brought up and discussed, and we were given the assurance—

MR. BEDKE: To which we object again unless he testifies what was said.

THE COURT: What was told to you and by whom?

Q. Do you remember who told you, and first what was told to you and who told it to you?

A. Well, Mr. Compton told us that Rita B. Compton would be no problem in securing a release of title to transfer the property and that her signature was not necessary on the Receipt and Agreement to Purchase."

Dallin Reese testified on cross-examination:

"Q. Okay. Now, at the time of the signing of this Exhibit 2, this Earnest Money Agreement, you stated there was a discussion about whether or not Mrs. Bateman should sign; is that correct?

A. Yes.

Q. Who brought that up?

A. I think Ross did.

Q. And you had some, at least Rexburg Realty had some concern whether or not Mrs. Bateman would go along with this arrangement?

A. Yes, we had a concern.

Q. Well, do you know where Mrs. Bateman was at that time?

A. Only what came out in the discussion that she was at her home.

Q. And what did Mr. Compton tell you about where Mrs. Bateman was?

A. He told us that she was at home, and we asked him if her signature was necessary or that if we should go over there, and he indicated and told us there was no problem, that the deal would be consummated under his signature and that the only time her signature would be necessary would be in the closing and transferring of the Deed.

.    .    .    .    .

Q. Isn't it true, Mr. Reese, that Mr. Compton said that his mother lives just a short distance and you could go up and see her if you wanted to?

A. No.

Q. Do you know where she lived?

A. No, not exactly, no.

Q. Did he ever tell you not to bother his mother about the sale?

A. No."

On direct examination, Dean Compton testified:

"Q. Would you state to your best recollection what was said and by whom?

A. We talked about it, and Mr. Ross Reese—that is the first time I ever met Mr. Ross Reese—talked about the Agreement. He showed us what was the offer and what the terms were and what the prices were and how much was to be paid down, and we looked it over and there was a minor change we wanted to make pertaining to some scrap iron that was around the shed. We may have deleted a few words in this regard and initialed it. I initialed it. Mr. Ross Reese talked to us at length about what we could do with our money after the sale in way of an investment and so forth and tried to give us some counsel and whatnot of what we could do in this regard, and then we signed the Agreement. I signed it and my wife signed it. It was already signed by Mr. Robison and Mr. Christiansen. And then when they were about to leave, it was in the late afternoon, it was not evening then, I don't believe, and then the question came up about my mother and her interest in the farm and her signature being required on this, and I made the offer distinctly to them, I said, "My mother lives up here in Elwood, which is about 15 or 16 miles from here," and I said, "if you would like, we can get in our car and we will go up and get her signature on this," and they discussed it and then said, "Well, I don't think it is necessary," and they made the decision not to go see my mother, and I made an offer to take them up, and so they left then with the Earnest Money Agreement, and I took them back to the airport."

On cross-examination, Dean Compton testified:

"Q. Now, Mr. Compton, knowing there had been a couple of changes to the Earnest Agreement, why did you not insist that the provision be made in there that would nullify the Contract if your mother's signature was not obtained?

A. Well, this isn't the Earnest Money Agreement.

Q. Yes, this is the Earnest Money Agreement, Mr. Compton.

A. Excuse me, I was thinking—well, I don't know why I didn't. Why didn't the realtors insist on it. I never thought about it.

Q. You have heard the realtors testify that they relied on your assurances from you, did they not, that your mother's signature was not necessary?

A. And you heard me testify that we offered to take them up to my mother's to get her signature.

Q. Was there some reason why you didn't insist on them going?

A. Yes, because they said, "Well, maybe it's not necessary. Let's not bother."

Q. Did they say maybe it's not necessary?

A. I don't recall if those are the exact words, but they made the decision; we made the offer.

.    .    .    .    .

Q. At the time you testified that you offered to take Ross and Dallin Reese to you mother's home to obtain her signa-

ture, did they give you a reason for not wanting to go to your mother's home to obtain her signature?

A. I think they wanted to get home before dark in the airplane and didn't want to take the time.

Q. Isn't it true it was already dark?

A. I don't think it was.

Q. Do you remember what time of day it was?

A. Five years ago . . . I don't think it was dark, but I don't remember the time or hour, no.

Q. How far away was your mother's home from yours?

A. Fifteen or sixteen miles.

Q. They told you they wanted to get home before dark?

A. I believe that is what their reason was for deciding not to go up."

Carol Compton, on direct examination, testified:

"Q. And do you recall any conversations concerning your mother-in-law signing the papers?

A. Yes, I can remember it was mentioned. We brought it up, and Dean wondered.

Q. Well, would you relate to your best recollection what was said relative to that subject?

A. I can't remember exactly, but I know at the time Dean said, "Now, do you think we need Mother's signature? She just lives up here about 15 miles, and we can drive up and get it if you think we should have it."

Q. And was there any reply made to that?

A. Well, I can't remember just what it was, but they didn't say, yes, to go get it.

Q. Was there any attempt made to go, or did they even start to go?

A. I thought they said they wanted to get home before dark."

Following the Compton's testimony, Ross Reese was recalled. On direct, he testified:

"Q. You have heard both Mr. and Mrs. Compton testify that an offer was made to you to drive you to Dean's mother's home to sign the Earnest Money Agreement. Did they in fact make such an offer?

A. Absolutely not. It was late at night, and there was no inference at all we could go to his mother's place at all that night.

Q. Was the subject of his mother's signature on the Earnest Money Agreement discussed?

A. Yes.

Q. And you earlier testified on the stand as to his assurance that it was not necessary?

A. That is correct. The time statements are verifiable if I had access to them and the flight plan filed with the Flight Service."

Dallin Reese was recalled and on cross-examination, testified:

"Q. Mr. Reese, do you recall that Mr. Compton made a suggestion at that time that you were discussing the signing of the Earnest Money Agreement? Do you recall anything said about going up to Elwood and contacting his mother?

A. Something may have been said then at that time to go up there to Elwood and contact his mother. I don't recall the exact conversation as to how it went and as to what the final decision was and even as to who made the final decision in that regard.

Q. But you do recall something said about going up to Elwood to get his mother's signature at that time?

A. Well, I recall that we talked about his mother's signature being on the Receipt and Agreement to Purchase and discussed the matter considerably at some length.

Q. And do you also recall that there was a conversation that she lived at Elwood, approximately 15 miles away, and could be contacted?

A. I recall now, since you mentioned Elwood, that is where she lived, yes.

Q. And do you recall that was mentioned, that she could have been contacted to sign the Agreement?

A. If it would have been necessary, if we had all parties agreed it was necessary. That possibly was so.

Q. I believe that's all."

Dallin Reese on redirect examination testified:

"Q. Mr. Reese, did Mr. Compton tell you it was necessary to get his mother's signature?

A. No.

Q. Did he at any time ever tell you it was necessary to obtain his mother's signature before that deal could go through?

A. *I think the only time that it was ever indicated that his mother's signature would be necessary on any documents was when the final draft of the Contracts were drawn and the closing process was taken care of.* He indicated to us and to me that she wanted to sell, that she would go along with his decision in any regard, as to how and the terms and everything, but that her only involvement, unless we insisted, or something to that effect, would be at the time of the closing.

Q. Isn't it true based on your knowledge, being in the real estate business and based on your knowledge of the Idaho Real Estate Law that the only time that she would have to sign to convey is when the final Contract or Deeds were signed?

A. Yes.

Q. And is that the reason that you were not concerned about it?

A. Well, that was one of the reasons, yes.

Q. Was the other reason because he assured you that she would go along with what he recommended?

A. Yes.

Q. And isn't it true that those assurances were given to you at the time that the Listing Agreement was signed and then they were given to you again at the time that the Earnest Money Agreement was signed?

A. Yes.

Q. And isn't that the reason you proceeded to solicit or seek prospective purchasers and do what you did to find these buyers, who were ready, willing, and able to purchase?

A. Yes." (Emphasis added.)

Here, then, is the statement of the agent of respondent that Mrs. Bateman's signature was specified as necessary "when the *final* draft of the contracts were drawn and the closing process was taken care of." The earnest money agreement was in form the final draft of the contract. Mrs. Bateman's signature may have been an express condition of its validity. If so, the agreement should not have been considered valid, or ever delivered as final to the buyers.

Any admission of a party is not to be disregarded unless explained. In this case, the attempted explanation of the statement merely showed a lack of understanding of the import of the agreement itself.

It cannot be determined from the trial court's finding of fact that the trial court addressed the issue of whether Comptons required Mrs. Bateman's signature on the earnest money agreement as a condition of its finality. If so, no acceptance of the buyer's terms took place. *See C. Forsman Real Estate Co. v. Hatch,* 97 Idaho 511, 517, 547 P.2d 1116 (1976).

The cause should be remanded, with appropriate direction for further findings of fact and conclusions of law.

BISTLINE, Justice, dissenting.

I.

The Court's opinion contains a factually accurate portrayal of the underlying facts which gave rise to the fee dispute until the final paragraph wherein it is stated that "the agreement has been signed by two of the co-owners *with representations* made to the broker by the signing co-owners that the contemplated transaction would be approved by the third co-owner." (Emphasis added.) No *representations* were made that can be found in my reading of the record. Nor do I find anything to substantiate the Court's following statement which declares that the record supports the con-

clusion "that Dean Compton at least impliedly, if not expressly, *represented* to Rexburg Realty that he was *authorized* to sell the property on behalf of his mother, Mrs. Bateman." This statement, like the one preceding it, is overly broad, and puts the Court in the position of not only administering the *coup de grace* to I.C. § 9–508, but unsettling the provisions of I.C. § 9–503 and 9–505(5) as well.

Until today I had always thought it to be the law that a man could not legally be a real property agent for his mother, or a mother be such agent for her son, "unless the authority of the agent be in writing, subscribed by the party to be charged." In order to justify a representation of authority to act on behalf of another in regard to real property, an appointment of such agency in writing would not be just the best evidence of that fact, but indispensable.

The Court's opinion also makes careless use of the word "authorized." The fact is, however, that he did not have such authority, and did not represent that he did. Counsel for the Comptons states it very well in this language:

"The instant case contains no agency, either expressed or implied, and no representation whatsoever on the part of the Comptons. There is a definite difference in saying 'I can sign for the corporation' and 'Mother usually goes along with what I want.' The former is a statement of present ability, and the latter a hope of being able to persuade."

As it turned out, Mother Bateman did not go along with what her son wanted to do. The trial court made the specific finding: "The mother did not sign the agreement, nor was she asked to." As to the placing of blame for the impasse which came about on her refusal to participate in the sale, the trial court's finding is:

"Now the plaintiff (Rexburg Realty) knew from the outset that the mother had an interest in the property, but defendant Dean Compton assured plaintiff there'd be no problem: 'She will go along with it; she wants to sell,' or words to that effect."

In denying a plaintiff's motion for summary judgment the trial court ruled that the primary triable issue of fact was that raised by Compton's affidavit:

"The court sees only one issue of fact in this case, and that issue is raised by affidavit of defendant, . . .
' * * * that the Plaintiff Realtor knew that as a condition precedent to there being a valid employment contract * * * that the consent and signature of Rita Compton Bateman was a necessary condition to the enforceability of the contract * * *. Plaintiff failed to obtain the consent and signature of Rita Compton Bateman to the employment contract * * and as a result of such failure the employment contract * * * is not valid.' "

In determining the cause on the merits the trial court expressed his view that he was governed by *Forsman v. Hatch*, 97 Idaho 511, 547 P.2d 1116 (1976), and *Garfield v. Tindall*, 98 Idaho 841, 573 P.2d 966 (1978), without elaborating on how he concluded that those two cases should govern this.

Before judgment was entered the Comptons moved that the findings be amended to reflect:

"1. That there was no collusion among defendants and Bateman, as co-owners, to defeat the sale to the prospective buyers found by Plaintiff, Mrs. Compton's distress at finding sale negotiations had collapsed supports this finding.

"2. That Defendant Dean Compton made no express or implied representation on behalf of Mrs. Bateman. This additional finding is consistent with evidence presented by both Plaintiff and Defendant during the trial."

Responsive to that motion, the trial court added as additional facts found:

"The parties did not try any issue of collusion between the defendants or either of them and mother of defendant Dean Compton.

"The parties did not try any issue of agency between the defendants, or either

of them and the mother of the defendant Dean Compton."

The trial court offered no explanation for not making the findings requested, and suggested no reason for the rather unusual "findings" added which simply are not findings of fact. Regardless of the non-findings, it seems to be accepted in the Court's opinion that there was no collusion on the part of the Comptons, and there was not any representation by the Comptons that Dean Compton was an agent of his mother with power to represent her in listing the farm.[1] So we get down to a consideration of the legal effect of "assurances."

As urged by the Comptons, the issue of law here is whether Compton's "assurances"[2] that his mother would go along with whatever the Comptons agreed upon precludes the applicability of I.C. § 9–508. It is beyond dispute that Compton did, and honesty, tell the real estate salesman and broker from Rexburg Realty that he expected that his mother would go along with any deal which satisfied the Comptons.

At the very most, that is all that can be said as to Compton's "assurances." The salesman and broker for the realty company both knew all along that Mrs. Bateman was a substantial part owner, and knew also she was not Dean Compton's spouse—nor was she a subservient shareholder in any corporation under Compton's dominion, but owning the farm.

Such being the case, I am wholly unable to comprehend what reasoning is behind the Court's conclusion that Compton's assurances rendered nugatory the provisions of I.C. § 9–508. The holding of *Forsman v. Hatch, supra,* was simply that Mr. Hatch, as manager of the community comprised of himself and Mrs. Hatch, could bind himself to the payment of a commission without

Mrs. Hatch's signature—notwithstanding her ownership interest in the property. In *Garfield v. Tindall, supra,* the ownership of the property involved was partly in the name of Tindall and his wife and the remainder in a family corporation over which Tindall either had control or actually *represented* that he did have control.

My concurrence in *Garfield v. Tindall* was gained, as to the community property, under the compulsion of *Hatch,* and as to the corporate property, under an estoppel theory relied upon by the trial court. Because it is apparent that the Court is now going far beyond the bounds of those two cases, it has become necessary to review those two decisions in comparison to the facts of this case.

## II.

A review of the facts of this case will illustrate the kind of problem which will recur so long as I.C. § 9–508 is given the desiccated reading provided in the majority opinion. The first contact between the Comptons and the real estate broker was initiated not by the Comptons, but by the broker. Having heard that the Comptons were thinking of selling their farm, the broker approached them with the suggestion that he was an interested purchaser, and was thus able to get them to set a price on the property. Having so stimulated their interest, he then said he'd "have to see" whether he could come up with the $70,000 in cash which the Comptons said they wanted as a downpayment. He returned to say that he couldn't come up with the cash, but announced—for the first time—that he just happened to be a real estate broker, and one who could list the property and help them sell it. By that time he had already, by independent inves-

1. Rexburg Realty opens its argument with the assertion that "The facts in this case are abundantly clear and the only question to be resolved by the Court is one of Law."

2. As far as "assuring" Rexburg Realty goes, however, not even their salesman or broker testified that Compton used this particular language. On the contrary these witnesses testi-

fied only that Compton told them that his mother usually went along with what he decided, and also that she had expressed some desire that he sell the farm to make it easier on him. Thereafter, it was only in the leading and conclusionary questions of counsel for Rexburg Realty that any use was made of the words "assured" or "assurances."

tigation, made himself aware that Mr. Compton's mother was a co-owner of some of the property. The broker prepared the listing agreement and gave it to Mr. Compton with the suggestion that he take it home, look it over, and have his wife sign it. There was discussion at that time of the fact that Mr. Compton's mother also owned an interest in the property, and according to Mr. Compton *he asked the broker* whether his mother's signature on the listing agreement would be necessary as well. To that question the broker only responded by asking "what kind of relationship" Mr. Compton had with his mother; when told that "she usually goes along" with what Mr. Compton wanted, and that she herself had expressed a desire to sell the property, it was *the broker who told Mr. Compton her signature would not be necessary.* After the earnest money agreement was presented to the Comptons, and they signed it, Mr. Compton offered to take the agreement over to his mother's house for the purpose of obtaining her signature. Again it was the broker who said that it wouldn't be necessary to do so.

The majority declares that the result which they obtain in this case follows from *Hatch.* The dissent of Justice McQuade in that case, however, is far more persuasive. A recent case similar on its facts was handed down about the same time as *Hatch.* In *Eastern Oklahoma Land & Cattle Co. v. Dorris,* 549 P.2d 78 (Okl.1976), a widow contacted a broker to obtain his services in selling land belonging jointly to the widow and her five children. The broker was fully informed of the joint ownership of the land, and no promises were made by the widow that all would agree to convey. After the widow signed the listing agreement, the broker procured a buyer ready, willing, and able to purchase the property. The children, however, refused to agree to the sale, and the deal was never consummated. When the broker sued for his commission, the trial court dismissed the complaint, which dismissal was affirmed on appeal:

> "The broker has a right to presume that his principal owns land or is authorized to make a sale thereof when it is listed with

the broker. We agree this is the general rule. However, an exception to the rule exists where a broker employed to sell real property knows, or should know, that the one employing him will be unable to give a good title or that one having an interest in the property will not join in the sale. If a real estate broker, at the time he makes a contract with the vendor for the sale of his real property knows of any defects in the owner's title, or is aware of facts sufficient to put a reasonably prudent person on inquiry which, if followed with reasonable diligence would advise him of any such defect, the broker is not entitled to recover a commission if the sale fails because of the defect. *Best v. Kelly,* 22 Wash.2d 257, 155 P.2d 794, 156 A.L.R. 1387 (1945). . . .

"The applicable rule in such cases is set forth in *Stevenson & Tomm v. Barnes,* 274 P.2d 531, 534 (Okl.1954), in which the court said:

> " 'It is essential to the broker's right to commissions where the transaction in question fails of consummation because of a defect in, or absence of, title, that he himself is not at fault and that he does not have knowledge or notice of the defect in, or absence of, title at the time of finding the customer.' " *Id.* at 80.

## III.

Justice McQuade in his dissent in *Forsman v. Hatch,* with both acumen and vision prophesized that the majority's holding in that case would "invite brokers to accumulate promises of commissions *from the unknowing* when there is no real expectation that a sale will ever result." 97 Idaho at 518, 547 P.2d at 1123. The emphasis supplied is my own. There is much to be said for that of which he adequately forewarned:

> "The majority opinion protects the realtor against the owner of real property, even though the former is in most instances more knowledgeable and expert than the latter. The majority opinion does nothing to safeguard against the

possibility of a broker generating a fee by persuading one spouse, unschooled in business matters, to sign a brokerage contract, which the other spouse might never had agreed to." *Id.* at 518, .547 P.2d at 1123.

Justice McQuade also had a better grasp on the Idaho law of community property than did the other members of the Court wherein he pointed out that under our theory neither husband nor wife can say as against the other that "I own it." Nor can either point to an undivided interest and say that such is his or hers. The key word describing each spouse's interest, back in law school at least, was "moiety," which was equated with the proposition "that the interests of the husband and wife in the community property are present, equal, and existing interests during. the marriage itself." deFuniak and Vaughn, Principles of Community Property, 2d ed. § 105, p. 261–62.

Such was exactly what Justice McQuade wrote, and its truth is unassailable. There is only *one* owner of community real property in Idaho, and that one owner is the husband and wife who own it.

A case footnoted by Justice McQuade is very suggestive. *Anderson v. Idaho Mutual Benefit Ass'n,* 77 Idaho 373, 292 P.2d 760 (1956), although it did not involve real property, did involve the management of and disposition of community property. As I read that case, it stands for the proposition that one spouse acting alone is not authorized to give away community property.

The *Forsman v. Hatch* majority, however, would say to the contrary. But such a view presents real problems. Assume, for example, that a husband decides to sell the community property ranch for $500,000, but the wife says no. The husband, notwithstanding the wife's refusal, can go right ahead and list it for that price, agree to give a 10% commission of $50,000, and the community assets are then quickly reduced by $50,000—all in the face of the wife's objection. That to my mind is a windfall to the broker, and a windfall is a gift. Nothing precludes the husband from listing the farm with four

brokers on the same terms. If all find buyers, the wife sees the community assets reduced by $200,000. And, of course, a disgruntled husband (and now with the law changed as it is, the wife as well) may very well be possessed of an intent to defraud his wife, or force her into a quick sale in contemplation of divorce. He could be in cahoots with a broker, or with a buyer, and the wife never the wiser. I.C. § 9–508 more likely had for its purposes the protection of wives against ill-starred arrangements with real estate brokers, than it did to bar fraudulent claims of brokers.

It is *Forsman v. Hatch* which should be discarded, rather than I.C. § 9–508.

## IV.

The precise holding of *Garfield v. Tindall,* and so declared, was simply:

"We hold that a co-owner of property, who has expressly or impliedly *represented* to the broker that he can convey the property to be sold, cannot escape personal liability under a brokerage commission contract because it was not signed by the other co-owner(s)." 98 Idaho at 843, 573 P.2d at 968 (Emphasis added.)

I have with much deliberation emphasized the word "represented" and with good reason. Such is the key word in our holding in that case. Without that word appearing, and knowledge of that which it signifies, I would not have concurred.

Representation, falsely made, or made under circumstances constructively leading to a false representation, is, of course, an essential element in the doctrine of estoppel. Recently in *Tommerup v. Albertson's, Inc.,* 101 Idaho 1, 607 P.2d 1055 (February, 1980), the court quoted from *Bjornstad v. Perry,* 92 Idaho 402, 443 P.2d 999 (1968):

"Equitable estoppel generally requires that a false *representation* or concealment of a material fact be made with actual or constructive knowledge of the true state of facts; that the party to whom the false representation was made was without knowledge or the means of acquiring knowledge of the real facts; that the false representation was made

with the intent that it be acted upon, and that the party to whom it was made relied and acted upon it to his prejudice. 92 Idaho at 405, 443 P.2d 1002." *Tommerup*, 101 Idaho at 5, 607 P.2d at 1059. (Emphasis added.)

As the text American Jurisprudence states it:

"The doctrine of estoppel is based upon the grounds of public policy, fair dealing, good faith, and justice, and its purpose is to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon. The doctrine of estoppel springs from equitable principles and the equities in the case. It is designed to aid the law in the administration of justice where without its aid injustice might result." 28 Am.Jur.2d at 629 *Estoppel and Waiver* § 28.

Black's Law Dictionary, 5th ed., defines "representation" in contract law as:

"A statement express or implied made by one of two contracting parties to the other, before or at the time of making the contract, in regard to some past or existing fact, circumstance, or state of facts pertinent to the contract, which is influential in bringing about the agreement."

A thorough review of *Garfield v. Tindall* does produce the statement, at p. 842 of 98 Idaho, at p. 967 of 573 P.2d that "Tindall assured Clark that the corporate ownership presented no problems." Other than that, the word "assured" or the word "assurance" does not appear in the opinion; that language is clearly not the language of the specific holding of the case. The words "assured" and "assurance" are not words of legal significance other than in insurance law. *Black's*, p. 113. As used in the *Garfield v. Tindall* opinion I see only that the Court was not careful to say that Tindall *represented* his then present ownership and control of the corporate interest in the property, and that he was, as a matter of existing fact, in a position to see to it that the corporation would issue the requisite deed. The "assured" language in *Garfield*

*v. Tindall* was merely the author's choice in presenting the reader with a shorthand summary of the factual background of the transaction.

That this is so is borne out by resort to the appeal record in that case. The trial court decision was not based upon any "assurances" as to what the corporation might or might not do in the future, but on "representations." Citing an annotation found in 156 A.L.R. 1398, 1400, the trial court wrote:

"A property owner is obligated to act in good faith toward his broker and the broker should not be prevented from or deprived of the opportunity of consummating the sale on account of the conduct of the principal. Accordingly, a broker is entitled to rely on the *representations* of the party signing the agreement that he has the title or can get the title prior to closing."

Citing 12 Am.Jur.2d *Brokers*, § 194, p. 936, the trial court further wrote in his carefully worded decision:

"It is the general rule that unless the broker and his employer have stipulated to the contrary, the broker is entitled to his compensation upon the completion of the negotiations in question, irrespective of whether the contract negotiated was actually consummated or whether the failure to complete the contract was due to the default or refusal of the employer or to that of the party procured by the broker, so long as the failure to carry it through to a successful completion is not due to any fault of the broker."

But, added the court, citing 10 A.L.R.3d at 665:

"Thus, it is generally held that where the owner of the property is unable to convey full title, and that therefore the eventual sale does not come about and this is no way the fault of the broker, the broker may nonetheless recover the commission."

The trial court simply concluded that it was the owner, Tindall, who made the representation as to his ability to produce a deed, and that the broker was in no way at fault. Obviously the broker would ordinari-

ly not be expected to have any knowledge of the corporate structure.

It is also to be noted that the court there placed no reliance on *Forsman v. Hatch*, the opinion in that case having not been handed down prior to trial and judgment in *Garfield v. Tindall*. The court did, and correctly, resort to general principles of estoppel as found in the A.L.R. annotations and Am. Jur.2d.

### V.

Although the trial court in the case at bench ruled in favor of Rexburg Realty solely on the supposed applicability of the two cases just discussed, it is of interest that both parties in their briefs in this Court place substantial reliance on the general statements of the law found in Am.Jur.2d. Each party quotes an identical passage from 12 Am.Jur.2d *Brokers*, § 201 at 944:

" '§ 201. Defect in principal's title.

"In the absence of a stipulation to the contrary in the contract between the broker and his principal, it is the accepted general rule that the former is entitled to his commissions if, acting in good faith, he procures a purchaser willing, able, and ready to take the property upon the terms offered by the principal, although the contract is rescinded or the sale otherwise fails because of a defect in the principal's title, *of which the broker had no notice*. . . .' (Emphasis added)"

The brief of Rexburg Realty continues the passage with a further statement that a broker *not knowing of a defect* is not bound to inquire, and suggests that there exists a presumption, in favor of the broker, that the owner does have marketable title.

However, such is not this case. As Comptons point out, Rexburg Realty knew of the

---

3. The following questions were asked and answers given on Rexburg Realty's cross-examination of Mr. Compton:

"Q (By Mr. Jolley) In other words, we are talking about your signing an Agreement to pay 28,000 or $27,500, which is a lot of money, in other words. Did it cross your mind as to the importance of including something in either one of the two Agreements that we have talked about?

---

title problem both by its own independent inquiry, and from the Comptons. They cited us to a recent Oklahoma case precisely in point, and discussed above in Part II.

The issue in this case narrows down to a placing of fault, which the court below apparently did not consider, feeling itself bound by what was said in *Forsman v. Hatch* and *Garfield v. Tindall*. The authorities make it quite clear that any fault on the part of the broker precludes him from recovering.

In considering fault it is appropriate to consider both the backgrounds of the respective parties and the relationship entered into by a listing agreement for the sale of real property. Once the listing is signed, the broker is the owner's agent and held to a high fiduciary standard. It seems inconceivable to me that a state-licensed broker or his salesman is not also held to that same standard in obtaining the listing agreement. The Court today takes a step backward from those tenets of law which hold real estate brokers to a fiduciary standard in relationship to their clients; brokers will be permitted to collect commissions from owners regardless of the owner's lack of understanding as to his obligation for the commission on signing the listing agreement. This case well illustrates why the fiduciary standard should be continued. It is inequitable that an experienced real estate broker, undeniably aware of potential problems in the way of an ultimate sale of the property listed, should be permitted to collect $27,000 from a party who was totally unaware that liability might be incurred regardless of result. A better rule of law would require a broker to be as careful of explanation in obtaining signatures from the uninformed as are district judges required to be in accepting guilty pleas.[3]

"A I was certainly aware all the time that if the sale was made that we would have to pay a commission to the realtors.

"Q Are you aware of the language in the court that says if they find a buyer irrespective of their sale you are obligated to pay a commission?

"A I don't think I was fully aware of that when I signed the Listing. I didn't read the

482

The entire flavor of the testimony brought out, or attempted to be brought out, by Rexburg Realty was that its broker and salesman were told real estate law by the Comptons—the farmers supposedly telling the licensed experts in their own field—that the signature of co-owner Mrs. Bateman was not necessary. The same people nevertheless did tell Mr. Compton that he would have to obtain his wife's signature. It does seem a bit ludicrous. In actuality, the record shows that Comptons did nothing or said nothing to dissuade Rexburg Realty from obtaining Mrs. Bateman's signature. I am in total agreement with that which Judge Beebe, Justice Pro Tem., has written, other than my ultimate conclusion is that the judgment should be reversed and the action dismissed.

Patricia L. McDermott of McDermott & McDermott, Pocatello, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Myran A. I. Stahman, Deputy Attys. Gen., Boise, for plaintiff-respondent.

fine print. Mr. Dallin Reese didn't state, 'Be aware if you sign this you are going to owe us this much money.' Nothing was talked

about that. He said it was just five percent commission. I never thought too much more about it."