670 P.2d 1294

MERIDIAN BOWLING LANES, INC.,
An Idaho Corporation, Plaintiff-
Counter-Defendant-Appellant,

v.

MERIDIAN ATHLETIC ASSOCIATION,
INC., An Idaho Non-Profit Corporation,
Defendant - Cross - Defendant - Counter-
Claimant-Respondent, Cross-Respon-
dent,

and

Hepper Homes, Inc., An Idaho Corpora-
tion, Defendant-Counter-Claimant-
Cross-Claimant, Respondent, Cross-Ap-
pellant.

No. 14033.

Supreme Court of Idaho.

Oct. 12, 1983.

F. Michael Burkett, Jr., of Park & Meuleman, Chartered, Boise, for Meridian Bowling Lanes, Inc.

Cumer L. Green, and Willis E. Sullivan III, of Green & Sullivan, Boise, for Meridian Athletic Ass'n.

Fredric V. Shoemaker, and Christopher Burke, of Clemons, Cosho & Humphrey, Boise, for Hepper Homes, Inc.

DONALDSON, Chief Justice.

In 1959 plaintiff-appellant, Meridian Bowling Lanes, Inc. (MBL), purchased a parcel of land from defendant-respondent, Meridian Athletic Association, Inc. (MAA), upon which MBL built bowling lanes. MAA retained ownership of land contiguous to the MBL property. With the permission of MAA, MBL established a small dirt roadway across a corner of MAA's property for additional access to the MBL's parking lot. In April 1974, MBL purchased from MAA an additional strip of land from the remaining MAA property. At approximately the same time, MAA orally granted to MBL a right of first refusal on the remaining MAA property, permission to use the roadway across MAA's property and permission to erect a business sign on MAA's property.

On January 4, 1977, MAA received an offer to purchase its remaining property from third parties by way of a signed earnest money agreement. MAA submitted a counter-proposal which was orally accepted by the third parties. This agreement was sent to MBL's president, Mr. Gene Quintieri, with a cover letter stating that the offer was submitted pursuant to MBL's right of first refusal and requesting a response within three days. In deposition testimony, Mr. Quintieri stated that he called MAA's attorney and requested further explanation of the terms of the offer which further explanation was promised.

He further testified that he received no response from MAA. The third parties did not purchase the property.

In May 1978, defendant-respondent, cross-claimant, Hepper Homes, Inc. (HH), offered to buy the property. MAA accepted their offer without forwarding the offer to MBL. A condition of the sale which was consummated on August 21, 1978, was that the roadway and sign be removed from the property. On May 3, 1979, MAA's attorney wrote to MBL that HH wanted the road and sign removed. Subsequently MAA closed the road.

MBL brought suit seeking to enforce its right of first refusal or for an award of damages resulting from MAA's breach of the contract with respect to the right of first refusal. Summary judgment was granted in favor of MAA filed December 15, 1980, and later in favor of HH filed April 22, 1981. HH and MAA had filed cross-claims which were dismissed in a judgment filed April 22, 1981. MBL appeals from the judgments granted in favor of MAA and HH. We reverse. HH appeals from the judgment dismissing its cross-claim. Because of the resolution of the principal appeal between MBL and the respondents MAA and HH, the appeal of HH is premature.

Before we address the main issues of this case, we will consider and dispose of a procedural question—whether or not MBL's notice of appeal was prematurely filed. In order to consider this question, the following chronology is important:

*October 28, 1980:* Memorandum Decision granting summary judgment in favor of MAA filed,

*December 9, 1980:* Court Minutes reflect that summary judgment granted in favor of HH,

*December 15, 1980:* Findings of Fact and Conclusions of Law with respect to the granting of MAA's motion for summary judgment filed,

*December 15, 1980:* Judgment in favor of MAA on its motion for summary judgment against MBL filed,

*December 30, 1980:* Findings of Fact and Conclusions of Law and Decision with respect to the granting of HH's motion for summary judgment filed ("Counsel for Hepper shall prepare a proposed form of judgment and memorandum of costs consistent with the foregoing"),

*January 15, 1981:* Memorandum Decision and Order with respect to the cross-motions for summary judgment by MAA and HH filed,

*January 20, 1981:* Notice of Appeal against the respondents MAA and HH from the judgment filed December 15, 1980, filed,

*January 30, 1981:* Order denying cross-motions for summary judgment by MAA and HH filed,

*April 22, 1981:* Judgment in favor of HH on its motion for summary judgment against MBL filed, and

*April 22, 1981:* Judgment re: Attorney Fees/HH v. MAA filed which denied cross-motions for summary judgment and dismissed the remaining claims.

MBL's Notice of Appeal filed on January 20, 1981, was premature as it was from an I.R.C.P. 54(b) judgment and it was not certified as appealable under that rule. However, in the interests of judicial economy and being cognizant of amended I.A.R. 17(e)(2) (effective July 1, 1983),[1] we conclude that the filing on April 22, 1981, of the two formal judgments which disposed of the remaining claims cured the defect as of that date. Except for the formal written judgments entered April 22, 1981, all claims involved in the case were resolved prior to the January 20, 1981, Notice of Appeal.

■ This case involves an alleged right of first refusal which would apply to the land sold by MAA to HH. A preemptive right of first refusal is a legitimate contractual right. *See Garmo v. Clanton,* 97 Idaho 696, 699, 551 P.2d 1332, 1335 (1976) (held a preemptive right of first refusal agreement to be enforceable must provide for a definite price or for a means of determining the price). The record discloses that the terms of the right are disputed.[2] MBL asserts that the right required that MAA, if it were willing to accept a bona fide third-party offer to purchase, MBL notice of that offer and an opportunity to purchase at those terms. MBL asserts that the right was to apply to all bona fide offers until the property was ultimately sold either to MBL or, following a rejection of a particular offer by MBL, to the party making the offer which MBL rejected. On the other hand, MAA contends that the right applied only to a single bona fide offer and that the right would evaporate if MBL rejected that one offer. The terms of the agreement present genuine issues of material fact which preclude the grant of summary judgment as a matter of law. The depositions in the record adequately support this conclusion.

■ Argument was also presented that a continuing right of first refusal would violate I.C. § 55–111. We disagree. While *Garmo v. Clanton,* 97 Idaho 696, 699 n. 3, 551 P.2d 1332, 1335 (1976), noted that it did not consider the applicability of I.C. § 55–111 (prohibition against suspension of the power of alienation), we hold that a preemptive right of first refusal at the owner's own price or a third-parties' bona fide offer which the owner is willing to accept does not suspend the absolute power of alienation of real property, I.C. § 55–111. *See*

---

**1.** I.A.R. 17(e)(2) (effective July 1, 1983) provides that:

"Premature Filing of Notice of Appeal. A notice of appeal filed from an appealable judgment, order or decree *before formal written entry of such document* shall become valid upon the filing and the placing of the stamp of the clerk of the court on such appealable judgment, order or decree, without refiling the notice of appeal." (Emphasis added.)

**2.** We do not address whether a right of first refusal with respect to the potential sale of land need be in writing because we agree with the district court that the communication by MAA of the first offer to MBL disposes of a statute of frauds question.

*Watergate Corp., v. Reagan*, 321 So. 2d 133 (Fla.Dist.Ct.App.1975); *cf.* 6 American Law of Property, § 26.67, at 511 (1952) ("[A] pre-emption [at offeror's own price] cannot be void for remoteness, nor does it effect a restraint upon alienation. Even though the pre-emption is unlimited in duration, it should be valid if it requires merely an offer at the offeror's own price"). Further,

"[a] right to a 'first refusal' of certain property is not made unenforceable by the mere fact that no price is fixed in the agreement at which the owner must offer the property before selling to any other person. Before accepting a bona fide offer of a third person, the owner must give the plaintiff an opportunity to buy at the price *so offered.*" 5A Corbin on Contracts, § 1174 at 289 (1964) (footnote omitted); *see Garmo v. Clanton*, 97 Idaho 696, 699, 551 P.2d 1332, 1335 (1976); Annot., 136 ALR 138 (1942).

■ Regardless of whether the right of first refusal was limited to a single bona fide offer or was continuing in nature, the question remains whether MBL waived its right when it did not accept the first offer communicated to it by MAA.

"A waiver is the intentional relinquishment of a known right. It is a voluntary act and implies election by a party to dispense with something of value or to forego some right or advantage which he might at his option have demanded and insisted upon." *Crouch v. Bischoff*, 78 Idaho 364, 368, 304 P.2d 646, 649 (1956) (quoted approvingly in *Grover v. Idaho Public Utilities Commission*, 83 Idaho 351, 357, 364 P.2d 167, 171 (1961)).

After an examination of the record, we conclude that whether there was an expressed or implied waiver is clearly disputed.

"In order to establish a[n implied] waiver the intention to waive must clearly appear, and a waiver ... will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby unless by his conduct the opposite party was misled to his prejudice into the honest belief that such waiver was intended or consented to." *Smith v. Faris-Kesl Construction Co., Ltd.*, 27 Idaho 407, 429, 150 P. 25, 32 (1915) (quoted approvingly in *Grover v. Idaho Public Utilities Commission, supra* [83 Idaho], at 357–58, 364 P.2d at 171).

Deposition testimony of MBL's president at the motion for summary judgment level must be considered as truthful. *See, e.g., Smith v. Boise Kenworth Sales, Inc.*, 102 Idaho 63, 625 P.2d 417 (1981). Mr. Quintieri testified that when MBL received notice of the first offer that MBL requested further explanation of the terms which was not provided. This testimony is sufficient to reveal a genuine issue with respect to waiver.

■ When a trial judge passes upon a motion for summary judgment, and when this Court reviews the grant of a motion for summary judgment, the standard is the same—all facts and inferences are to be construed in a light most favorable to the nonmoving party and summary judgment under I.R.C.P. 56(c) is inappropriate if any genuine issue of material fact remains unresolved. *E.g., LaChance v. Ross Machine & Mill Supply, Inc.*, 102 Idaho 505, 633 P.2d 570 (1981); *Smith v. Boise Kenworth Sales, Inc.*, 102 Idaho 63, 625 P.2d 417 (1981); *Palmer v. Idaho Bank & Trust of Kooskia*, 100 Idaho 642, 603 P.2d 597 (1979). Here, summary judgment was inappropriate and we therefore reverse and remand. Costs to the appellant, MBL.

The disposition of the principal appeal vitiates the appeal regarding the cross-claims between the respondents, MAA and HH. The cross-claims are clearly dependent upon the resolution of the cause between MBL and the respondents. We therefore vacate the judgment on the cross-claim and remand the same to the trial court for determination with the principal action.

No attorney fees on appeal.

BAKES, BISTLINE, and HUNTLEY, Jr., JJ., concur.

SHEPARD, J., concurs in result.

BISTLINE, Justice, concurring in part.

Although I was at first inclined to fully join the Court's opinion, upon further reflection I see rather clearly that the opinion places undue emphasis on the doctrine of waiver, from which it springs to the conclusion that there is a dispute as to the underlying facts giving or not giving rise to a waiver—thereby making summary judgment inappropriate. In addition, the Court's opinion fails to note or consider that the offer of the third party, which led to a mutually acceptable counter-proposal, included a $5,000 earnest money payment. The earnest money offer to purchase required acceptance in five days. This explains the relatively short period of time, three days, which Meridian Athletic Association extended to Meridian Bowling Lanes as the allotted time in which to exercise the *oral* grant of the right of first refusal. The third party, Fuller-Svaty, did not go ahead on the transaction, and, apparently, neither did Meridian Bowling. That its president, Mr. Quintieri, testified by deposition that he wanted further explanation of the terms agreed upon by Fuller-Svaty and Meridian Athletic Association does not appear to rise to the presenting of genuinely disputed fact issue. He was given a copy of the January 1977 written earnest money agreement and the agreed-to counter proposal which raised the earnest money deposit to $6,000, required an additional down payment of $1,000 over and above the Labor Day payment of $5,000 provided for in the Fuller-Svaty offer, and increased annual payments to $12,000 instead of $10,000, commencing in January of 1978. The total purchase price remained as offered, $150,000. While it does seem difficult to ascertain from the earnest money agreement the interest rate on the unpaid balance, ordinarily the legal rate would apply if no interest rate has been charged.

There seems to be no contention that the Fuller-Svaty offer was not bona fide. Accordingly, offered the opportunity to purchase on the same terms, Meridian Bowling would either accept the proposition, or decline to do so. The right to decline is that which sets options apart from mutually obligatory contracts. The holder is the owner of a right of exercise.

As the trial court noted in its Memorandum Decision, "M.B.L. failed to exercise the option regarding the Fuller-Svaty sale. . . ." And this is the crux of it. An option is either exercised or it is not. Here it was not exercised—notwithstanding which, one and one-half years later it claimed that the option was still alive after Meridian Athletic Association made the transaction with Hepper Homes. It is true that to the court's statement above set forth was added this language: "thereby waiving, forfeiting and abandoning the option and causing it to terminate." Clearly use of the word "waiver" was not in the sense of the doctrine of waiver, but merely another way of saying that the option was not exercised. Equally so with the words "forfeit" and "abandon."

The important issue which the Court does not this day address is whether an option of first refusal survives after not being exercised on an opportunity to purchase on the terms of the first bona fide third party offer. The district court held that it did not. This Court should address that issue as readily as it addressed the option-of-first-refusal questions which were presented in *Gyurkey v. Babler,* 103 Idaho 663, 651 P.2d 928 (1982), which opinion was in point of time issued after the district court ruled in the instant case.

The *Gyurkey* controversy revolved around a written option, which as to terms of compliance was as equally silent as the oral option here involved. There we dealt with making precedential law which hopefully would avoid controversies. Today we decline to determine whether, absent specific language so providing, and certainly not in writing, an option of first refusal survives the failure to exercise a presented opportunity to meet a bona fide third party offer.

The district court in reaching its conclusions had before it the testimony of Mr. Quintieri, which in pertinent part included these statements:

"Q. And who was the person you primarily negotiated with representing the Meridian Athletic Association?

"A. There were several people. Mr. Bird, in particular I believe, was the president at that time. He was one of the prime people we negotiated with.

"Q. And what was the purchase price you paid for the property?

"A. We finally negotiated a price of $13,000 for that particular parcel of property.

"Q. Again, referring to Mr. Bird's testimony of yesterday, do you have any strong disagreements with that portion of his testimony that related to how the negotiations took place relative to purchasing the '70 foot wide piece of property'?

"A. Yes, to the point that he did not state the first right of refusal that we were granted for any additional purchases, plus the use of that road, as a permanent use of that road so we could improve it, pave it, spend monies on it so that our client, who was the Calico Pizza at the time, would have access from that entrance to his pizza parlor.

"Q. Let's talk about what evidently is one of two or three differences. You have testified that you disagreed with the first right of refusal in Mr. Bird's description of it. What was your understanding of your first right of refusal?

"A. My understanding was that if and when Meridian Athletic Association would want to dispose of any additional property, we would be given the right of first refusal to purchase that land. That right was granted to us.

"Q. Okay. And was that right to exist in perpetuity forever?

"A. That's my understanding.

"Q. And that right was to benefit the plaintiff corporation in this lawsuit; is that correct?

"A. Meridian Bowling Lanes, Inc., yes.

"Q. Now, you also, I think, were present yesterday when there was some testimony about an offer from Norman Fuller and partners in January of 1977; do you recall being apprised of that proposal made by Mr. Fuller and his partners?

"A. Yes, I received a letter from Mr. Jack Riddlemoser's office and in that letter was a copy of that offer.

"Q. And did you respond to that letter?

"A. I did not respond in writing, but I called. I called Mr. Riddlemoser's office and asked for an explanation as to whether those terms were right. Those terms did not spell out any interest charges. I wanted verification of that. And I was told that they would check into it and advise me.

"Q. You were told by who?

"A. Mr. Riddlemoser himself.

"Q. Do you recall when you made that phone call?

"A. Probably a day after I received it, or that same afternoon that I received it.

"Q. Do you recall when you received the letter? I'll represent to you that it's dated January 10, 1977.

"A. I don't think I received it until about the 12th or 13th, when I received the letter.

"Q. And did Mr. Riddlemoser get back to you?

"A. No, sir.

"Q. I take it it's your position that your first right of refusal was more than what Mr. Bird described to us as

being a one-shot first right of refusal?

"A. That is correct, sir.

"Q. Would you again characterize for me in your own words what you think your first right of refusal was.

"A. In my opinion, my first right of refusal was to either accept or reject an offer. If I rejected the offer and no one else accepted the offer, that would void that first right of refusal. I someone else accepted the offer, I, of course, would have lost my first right of refusal. If I had negated the acceptance of it."

Deposition of Quintieri, pp. 8–11.

"Q. All right. In your testimony earlier you were stating to Mr. Shoemaker what you understood the right of first refusal to consist of. I believe your testimony was to the effect that if the offer was presented but no one consummated the sale, that it would, and you used the word 'void' the right of first refusal?

"A. That's correct.

"Q. What did you mean by that? I want to just get a clarification on that.

"A. I just assumed that as long as the right to purchase that land was not granted to me upon the stipulation that I made, that it was a good deal and would wait further word from Mr. Riddlemoser. Subsequently, we were told, I don't know how we got the information, but that the Fuller's were not going to be the purchasers of the ground, that no one was going to be the purchaser of the ground.

"Q. Well, okay. Now, in the context of the way you used the word 'void,' the right of first refusal, what did you mean by that?

"A. I meant by that that it was not an offer made to me, that it had been voided out and subsequent offers would be tended to me again, as on the first refusal.

"Q. All right. Thank you.

MR. PARK: That's all I have.

RE–EXAMINATION

QUESTIONS BY MR. SHOEMAKER

"Q. Just a couple more. What was it that voided the offer that you just talked about?

"A. Are you referring to the offer from Norm Fuller?

"Q. Yes.

"A. In my opinion, no return call to me that the offer was a bona fide offer, and the report back that the Fuller's were not appraised of the offer or the acceptance of the counter-offer, that that just voided the whole thing. And it did not constitute an offer of first refusal.

"Q. You mean Mr. Riddlemoser's failure, as you state it, to return your call or get back to you, voided the offer?

"A. Right.

"Q. In your opinion?

"A. Yes.

"Q. And you mentioned some other communications relayed to you perhaps through Mr. Riddlemoser about Mr. Fuller's understanding of what his offer was?

"A. No, I didn't state that I got that from Mr. Riddlemoser.

"Q. Okay. So I understand you correctly, what voided the offer as presented to you, the Fuller offer, was Mr. Riddlemoser's failure, and you describe it, to get back to you; correct?

"A. Plus the fact that the Fuller's were not awarded the thing, the offer.

"Q. By 'awarded', you mean the sale was not consummated?

"A. Right.

"Q. It's your feeling that under this particular right of first refusal the third party offeror would have to

consummate the deal, in the event that you declined not to?

"A. If I would have declined the offer, I would have lost my right of first refusal. I did not decline the offer.

"Q. Did you accept the offer?

"A. I made mention it was a good deal and we would be interested in it if the terms as spelled out in the contract were correct.

"Q. Did anyone ever tell you that the terms were incorrect?

"A. No, I never heard that from them.

"Q. You inquired of Mr. Riddlemoser, as you put it, basically for clarification?

"A. Of that.

"Q. Did anyone ever tell you that the terms of the offer as transmitted to you under cover of Mr. Riddlemoser's letter of January of 1977 were incorrect?

"A. Not to my knowledge, that's what I was waiting to hear.

"Q. So you were never told that they were incorrect?

"A. Pardon?

"Q. You were never told the terms of the offer were incorrect?

"A. I wasn't told whether they were incorrect or correct."

Deposition of Quintieri, pp. 57–61.

It is difficult to say, as the Court's opinion does, that the district court erred in the view that the foregoing created an issue of fact, and that there remains a fact issue to be tried. The case is thus much like the opinion in *Shaw v. City of Rupert,* Idaho, P.2d (1983) (rehearing granted). As I see it, the only debatable issue is a question of law.

Although the district court upheld the oral option, an agreement made and respected by men of obvious integrity, which is heartening, the court was obviously of the view that Mr. Quintieri's testimony as a

matter of fact ruled out the survival of the option—or, equally possible, the court may have entertained that view as a matter of law. To send the controversy back for a trial to determine what the parties orally agreed to regarding the survival of the oral option acquired by Meridian Bowling Lanes almost ten years ago is to set a task most difficult and maybe futile as well, should it ultimately be held another five years hence that one bona fide offer passed on to an option holder who does not exercise his option, terminates the option. The district court here clearly held in ruling that "It is clear that had the sale been consummated, M.B.L. could not be heard to complain because it failed to exercise its option. Its right ended at that point. The fact that the Fuller-Svaty sale was not completed did not revive the M.B.L. option because M.B.L. had already intentionally abandoned the right to exercise the option by its failure to exercise the option in fact."

While in my view this case, and in my view a great majority of those we see, could be better and with more finality decided by a submission on the merits, and perhaps making use of depositions where feasible, I generally do not fault the Court's view that a trial on the merits was *here preferable* to a determination on a motion for summary judgment.[1] I do regret that the Court eschews the opportunity to provide some guidance on the question of law which still confronts the parties.

---

1. There was extensive discovery in this case, and it appears that the issue decided on motion could have readily been tried in a trial of less than a day. In a large number of cases this is so.