825 P.2d 1122

W.O. KEPLER, d/b/a Kepler Realty, John Lauziere, d/b/a Investment Consultants, and Seymour Abrams, Plaintiffs–Appellants,

v.

WHW MANAGEMENT, INC., an Idaho corporation, Willard R. Wood, Wallace A. Wright and W. Coy Wood, d/b/a Quality Inn & Convention Center—Pocatello Quality Inn—Westbank, Defendants–Respondents.

No. 18489.

Court of Appeals of Idaho.

Jan. 29, 1992.

P. Bruce Palmer, Blackfoot, for plaintiffs-appellants.

Racine, Olson, Nye, Cooper & Budge, Randall C. Budge, argued, Pocatello, for defendants-respondents.

SILAK, Judge.

This case arose when the owner of two motels entered into separate Real Estate Broker's Employment Contracts (employment contracts or listing agreements) with a real estate agency. The agency procured interested buyers for both motels; however, no sales were consummated. The realty agency, one of the interested buyers, and the interested buyer's cooperating broker sued the owner alleging that: (1) the owner breached both employment contracts by refusing to pay the promised commissions after the broker had fulfilled its obligation to procure buyers who were ready, willing and able to purchase the properties; (2) the owner fraudulently misrepresented his authority to sell the properties; and (3) the owner breached a purchase agreement

entered into with the interested buyer. The owner answered the plaintiffs' complaint and subsequently moved for summary judgment as to all claims. The district court granted summary judgment to the owner and the plaintiffs appeal. For the reasons set forth below, we affirm the judgment denying specific performance of one of the purchase agreements, but we reverse the summary judgment denying recovery of the commissions and on the claim raised on fraudulent misrepresentations.

## I. FACTS

Because we are reviewing a motion for summary judgment, we will set forth the facts in a light most favorable to the plaintiffs, the non-moving parties. At all times relevant to this action, W.O. Kepler was a licensed real estate broker doing business as Kepler Realty (Kepler) in Idaho Falls, Idaho. Willard Wood (Wood) was the President and majority shareholder of Intermountain Hospitality, Inc. (IHI), an Idaho corporation which owned the business operations of the Westbank Motel in Idaho Falls.

During this time, Wood was also president and a major shareholder of WHW Management, Inc. (WHW), an Idaho corporation which owned the Quality Inn, motel, lounge and restaurant (Quality Inn) in Pocatello. The eight acres of land underlying the Quality Inn were separately owned by Wood and Wallace Wright, the other major shareholder of WHW.[1] Wood and Wright leased this land to WHW.

### 1. *The Westbank Motel*

On August 23, 1984, Wood entered into a Real Estate Broker's Employment Contract with Kepler, through Kepler's agent, Charles McNeill, listing the Westbank Motel, restaurant and lounge for sale at $4.42 million. The buildings, land, and restaurant and lounge inventories associated with the Westbank Motel were specifically excluded from the written listing agreement, that property being owned by one Ferris

Clark, who leased the property to IHI. The obligations of the parties under the listing agreement were set forth as follows:

> In the event that you, or other brokers cooperating with you, shall find a buyer ready and willing to enter into a deal for said price and terms, or such other terms and price as I may accept, ... I hereby agree to pay you in cash for your services a commission equal in amount to 7% of the above stated selling price.

The termination date of the listing agreement was August 23, 1985. Prior to the termination date, Kepler, through McNeill, presented Wood with a potential buyer for the Westbank Motel. The potential buyer was identified to Wood as Steinbock & Hofmann, a law partnership from Los Gatos, California, specializing in real estate partnership ventures. The record contains the affidavit of McNeill recounting the course of dealing between Wood, McNeill, and Steinbock & Hofmann.

McNeill's affidavit states that after McNeill located Steinbock & Hofmann, McNeill met with Wood to discuss the specific terms and conditions of sale for the Westbank Motel. Subsequently, McNeill communicated to Steinbock & Hofmann the terms and conditions set out by Wood. Steinbock & Hofmann then prepared a letter of intent to purchase which was submitted to Wood via McNeill. The parties then scheduled a meeting in Idaho Falls for Steinbock, Hofmann, and their hotel manager to meet Wood and make final arrangements for closing the sale. The parties met on the morning scheduled, however, after approximately fifteen minutes, Wood left the meeting and remained unavailable for the rest of the day. Nevertheless, McNeill had communications with Wood in which Wood amended some of the purchase terms and asked about earnest money. McNeill conveyed the amended terms and earnest money issue to Steinbock & Hofmann, who then wrote an earnest money check for $10,000 and prepared a supple-

---

**1.** In their complaint the plaintiffs named WHW, Willard Wood, Wallace Wright, and Coy Wood as defendants. Wright and Coy Wood were never served and have been dismissed as defendants.

mental letter of intent to purchase based upon the amended terms requested by Wood. McNeill transmitted the earnest money and supplemental letter of intent to Wood. However, Wood failed to attend a meeting scheduled with Steinbock & Hofmann the following morning and did not meet again with Steinbock & Hofmann to discuss purchase terms.

For about the next five months, McNeill endeavored to have Wood either negotiate further with Steinbock & Hofmann or close the sale on the terms already offered and accepted. However, Wood continuously put McNeill off, stating that he was waiting for his son Coy's approval of the sale. After five months, McNeill was informed by Wood that the Westbank Motel would not be sold to Steinbock & Hofmann because Wood intended to sell the motel to his son, Coy, upon the same terms which had been offered to Steinbock & Hofmann.

### 2. The Quality Inn

Under a contract dated January 6, 1987, Kepler, again through McNeill, entered into another employment contract with Wood. Under this listing agreement the Quality Inn motel, lounge, restaurant, and eight acres of land were listed for sale for a listing period of 90 days. This listing agreement contained identical form language as the listing agreement for the Westbank Motel, which provided that Kepler's duty under the contract was to find a buyer "ready and willing to enter into a deal for said price and terms, or such other terms and price as I [Wood] may accept." However, the written provisions of the contract stated: (1) that the selling price was $7.2 million, (2) that Kepler would receive a commission of 10% of the stated price upon performance of its duties under the contract, and (3) that the buyer should assume the first mortgage of $3,200,000 and pay the balance in cash or upon terms to be negotiated.

In January of 1987, in cooperation with John Lauziere, a real estate consultant from Los Angeles, California, a buyer for the Quality Inn was located; namely, Seymour Abrams, a California businessman.

Abrams submitted through Lauziere a letter of intent to purchase, dated February 4, 1987, accompanied by earnest money of $2,500. In the letter of intent to purchase, Abrams stated he would purchase the Quality Inn for $7,200,000 and assume the first mortgage, and proposed terms for paying the balance of the purchase price. After listing the proposed terms, the letter of intent stated in conclusion:

> Please have your client [Wood] indicate his acceptance of this letter of agreement in the space provided below.
>
> After acceptance of this letter of intent your office should draft a formal contract for the appropriate signatures.

After Abrams' letter of intent was submitted to Wood in February, 1987, Wood agreed, at least personally, to its terms and signed the letter under the words, "Approved and Accepted." After signing the letter, Wood typed on the bottom of the letter, "I Willard R. Wood am signing as a stockholder; Wallace Wright the other major stockholder of Salt Lake City would also have to sign the agreement. Thanks." Wood then signed the letter of intent again beneath this addendum.

After the letter of intent of February 4, 1987, was signed by all the parties, and the earnest money was tendered by Abrams, McNeill, under Wood's direction, prepared a formal "Receipt and Agreement to Purchase" for Abrams' signature. This purchase contract embodied essentially the same terms which Abrams had proposed in his letter of intent, including the amount of $2,500 as earnest money. In connection with this purchase agreement, McNeill addressed a letter, dated February 20, 1987, to Lauziere. This letter was signed by both McNeill and Wood. In part, this letter states:

> As of this date Mr. Willard Wood, President and major stock holder of WHW Management Inc. is prepaired [sic] to enter into an earnest money contract with Mr. Seymour Abrams. For the acquisition of his Pocatello Quality Inn and 8± acres of ground.
>
> . . . .

After we receive the enclosed earnest money contract back with Mr. Abrams signature, Mr. Wood will proceed in a timely manner to secure financing. We are scheduling an April 1, 1987 closing date. We will try to meet this date, but an extension may be inorder [sic] if lenders drag their feet.

This letter was signed by Wood and sent to Lauziere. Subsequently, Abrams signed and returned the purchase agreement to McNeill, as requested in the letter. McNeill deposited the signed purchase agreement and the $2,500 earnest money previously tendered by Abrams into Kepler Realty's trust account, and subsequently tendered them to Wood. Wood never signed the purchase agreement after it had been returned to him by Abrams. After Wood received the earnest money and signed purchase agreement, Mr. Wood would not return McNeill's calls. In spite of McNeill's continued efforts, he was never able to arrange a closing of the deal with Wood.

On February 27, 1989, Kepler, Lauziere and Abrams filed a complaint against Wood and WHW, which complaint was amended in March of 1989. On April 21, 1989, WHW and Willard R. Wood filed an answer generally denying all of the allegations in Kepler's complaint and seeking dismissal of the complaint, attorney fees and Rule 11(a)(1) sanctions against Kepler and their attorneys. On August 22, 1989, WHW and Wood filed a motion for summary judgment with supporting affidavits of Wood, Wright and Coy Wood. Kepler countered the motion with affidavits from Lauziere, Abrams, McNeill and Kepler.

The district court heard arguments on the motion on November 16, 1989, and entered summary judgment in favor of Wood and WHW on December 4, 1989. The plaintiffs appeal the district court's order granting defendants summary judgment.

## II. ISSUES ON APPEAL

The following issues have been raised by appellants for resolution on appeal: (1) whether Wood was entitled to judgment as a matter of law against Kepler's claim that Wood breached the Westbank Motel listing agreement, (2) whether Wood and WHW were entitled to judgment as a matter of law against Kepler's claim that Wood breached the Quality Inn listing agreement, (3) whether Wood and WHW were entitled to judgment as a matter of law against Abrams' claim that Wood breached a purchase money agreement between Abrams and Wood, and (4) whether Wood was entitled to judgment as a matter of law against Kepler's claim of misrepresentation.

## III. STANDARD OF REVIEW

On appeal, the plaintiffs ask this court to reverse the district court's order granting the defendants' motion for summary judgment. Whether to grant a motion for summary judgment is a question of law, therefore:

When a trial judge passes upon a motion for summary judgment, and when this Court reviews the grant of a motion for summary judgment, the standard is the same—all facts and inferences are to be construed in a light most favorable to the nonmoving party and summary judgment under I.R.C.P. 56(c) is inappropriate if any genuine issue of material fact remains unresolved.

*Meridian Bowling Lanes, Inc. v. Meridian Athletic Ass'n, Inc.*, 105 Idaho 509, 512, 670 P.2d 1294, 1297 (1983). The standard for granting summary judgment is set forth in I.R.C.P. 56(c). In construing this standard, the Supreme Court has stated:

Summary judgment should be granted only when the pleadings, depositions and admissions, together with affidavits, if any, show that there is no genuine issue as to any material fact. The facts are to be liberally construed in favor of the party opposing the motion, who is also to be given the benefit of all favorable inferences which might reasonably be drawn from the evidence.

*Anderson v. Ethington*, 103 Idaho 658, 660, 651 P.2d 923, 925 (1982).

Pursuant to the rules stated above, our task on review is to determine whether, after viewing the facts presented—and the

inferences that can reasonably be drawn from those facts—in a light most favorable to the plaintiffs, Wood and WHW were entitled to judgment as a matter of law.

### 1. *Breach of Westbank Motel Listing Agreement*

■ For the reasons stated below, we conclude that Kepler has presented facts which raise a genuine issue as to whether Wood breached the Westbank Motel listing agreement, and therefore, summary judgment on that claim was improper.

■ It is a well–established rule of law that a real estate broker earns his commission when he procures a buyer who is ready, willing and able to purchase on terms acceptable to the seller. *Rogers v. Hendrix*, 92 Idaho 141, 144, 438 P.2d 653, 656 (1968); *Strout Realty v. Milhous*, 107 Idaho 330, 332, 689 P.2d 222, 224 (Ct.App. 1984). In light of the facts of this case, it is instructive to note that the Supreme Court has applied this rule in two cases in which no earnest money agreements had yet been entered into, although in both cases the broker had produced a buyer who offered to purchase on terms identical to or better than the terms specified by the seller. *Garfield v. Tindall*, 98 Idaho 841, 573 P.2d 966 (1978); *Marshall Bros., Inc. v. Geisler*, 99 Idaho 734, 588 P.2d 933 (1978). Whether a ready, willing and able buyer has been produced is a question of fact on which the broker has the burden of proof. *Strout Realty*, 107 Idaho at 332, 689 P.2d at 224. "It must be resolved by the fact finder if the buyer presented by the … broker was by the terms of the contract 'ready and willing' to purchase and whether the terms offered by that prospective buyer were 'acceptable' to the [seller]." *C. Forsman Real Estate Co. v. Hatch*, 97 Idaho 511, 517, 547 P.2d 1116, 1122 (1976).

■ The Idaho Supreme Court has recently noted that when a property owner and a real estate broker enter into a real estate broker's employment contract, "the owner has a duty to exercise *good faith* toward the broker and to compensate him for services rendered in accordance with the listing agreement." *Kepler v. Arave*, 117 Idaho 946, 949, 793 P.2d 178, 181 (1990). When a broker, pursuant to an employment contract, procures a buyer who is ready and willing to purchase on the terms and at the price fixed by the owner, the owner breaches the duty of good faith by interfering with or failing to cooperate in the broker's completion of performance. *Wallace v. McKenna*, 31 Idaho 477, 173 P. 749 (1918) (broker is not entitled to commission where broker has not met the conditions of performance specified in the employment contract, unless the broker's incomplete performance was caused by the negligence, fault or fraud or the owner); *Church v. Dunham*, 14 Idaho 776, 96 P. 203 (1908) (owner breached duty of good faith when owner, by his conduct, rendered broker's performance under the contract impossible); *Centers v. Yehezkely*, 109 Idaho 216, 706 P.2d 105 (Ct.App.1985) (real estate broker was entitled to commission for producing ready, willing, and able buyer for landowners' property, where terms of payment, including assumption of existing loan, corresponded to information contained in listing agreement signed by owners, and where broker testified that full-price offer actually was presented to owners.)

Assuming the truth of the facts presented by Kepler, a reasonable jury could find the following: that Kepler procured a buyer, Steinbock & Hofmann; that Wood articulated to McNeill terms of sale which would be acceptable to Wood; that McNeill communicated those terms to Steinbock & Hofmann, who submitted a purchase offer to Wood which was consistent with the terms that Wood said would be acceptable; that Wood requested $10,000 in earnest money from Steinbock & Hofmann; that Steinbock & Hofmann tendered $10,000 in earnest money to Wood; and that Wood subsequently refused to negotiate further with Steinbock & Hofmann although Steinbock & Hofmann remained ready and willing to purchase the motel on the terms which Wood had previously indicated would be acceptable.

These facts raise a genuine issue as to whether Steinbock & Hofmann offered to

purchase the Westbank Motel on the terms which Wood had stated as acceptable, and whether Kepler had procured a ready and willing buyer pursuant to the listing agreement. Therefore, a genuine issue has been raised as to whether Wood breached the contract with Kepler by refusing to pay the commission after Kepler had procured a buyer ready and willing to purchase on terms acceptable to Wood.

■ In addition, a genuine issue exists as to whether Wood's unexplained refusal to negotiate further with Steinbock & Hofmann was a breach of his duty to act in good faith under the contract, especially if Steinbock & Hofmann had already agreed to purchase the motel on terms previously put forth by Wood. Where no terms of sale were specified in the listing agreement, Wood's unreasonable refusal to negotiate terms of sale with any interested buyer would have effectively prevented Kepler from procuring a buyer ready and willing to purchase on terms acceptable to Wood. The principal to a real estate listing agreement cannot prevent or interfere with the performance of the agreement and then assert nonperformance as a defense. *Boyer Co. v. Lignell*, 567 P.2d 1112 (Utah 1977).

Kepler has presented facts which raise a genuine issue as to whether: (1) Kepler had procured a ready and willing buyer according to the terms of the listing agreement, and (2) Wood had breached the contract by preventing Kepler's performance of the contract. If at trial Kepler is able to prove the former, Kepler would be entitled to its commission under the agreement. If Kepler is able to prove the latter, Kepler would be entitled to compensation for the harm suffered as a result of Wood's breach. Based on the facts and reasoning set forth above, Wood was not entitled to judgment as a matter of law on Kepler's claim that Wood breached the Westbank Motel listing agreement.

### 2. Breach of the Quality Inn Listing Agreement

Assuming the truth of the facts presented in Kepler's affidavits and documentary evidence, a jury could find the following with respect to the parties' performance under the Quality Inn listing agreement: that Kepler, through McNeill, procured a buyer, Abrams, who was willing to purchase the Quality Inn for $7,200,000, assume the first mortgage, and negotiate terms for the balance of the purchase price; that Wood accepted the terms of sale proposed by Abrams in his letter of intent; that Wood requested that Abrams sign and return a purchase agreement which contained essentially identical terms as those proposed by Abrams in his letter of intent; that Abrams did sign and return the purchase agreement, tendering $2,500 in earnest money to Wood; that Wood subsequently refused to sign the purchase agreement; and that Wood, without explanation, refused to negotiate further with Abrams although Abrams remained both ready and willing to purchase the motel on the terms already agreed to by Wood and desirous of negotiating further the more detailed terms of sale.

The district court ruled as a matter of law that Abrams was not a buyer ready and willing to purchase on terms acceptable to Wood because Wood only conditionally accepted the terms of sale proposed by Abrams. In making this ruling the court erroneously failed to view the evidence in a light most favorable to Kepler. Wood claims that the addendum to the letter of intent in which he stated that Wallace Wright, the other major stockholder, would have to agree, made his acceptance of the terms proposed by Abrams conditioned on Wright's approval as well. On the other hand, Kepler claims that when Wood signed the document he gave his unconditional acceptance of the terms proposed by Abrams, and that the purpose of Wood's addendum was only to document the fact that Wright, as the other major stockholder of WHW, would have to sign off on the final documents transferring title.

Abrams' letter of intent also stated: "After acceptance of this letter of intent your office should draft a formal contract for the appropriate signatures." It is significant that after Wood signed the letter un-

474

der the words "approved and accepted," McNeill drafted a formal purchase contract that embodied essentially the same terms of sale proposed by Abrams in his letter of intent. Wood signed this purchase contract and McNeill sent it to Abrams who signed and returned it.

These facts raise several genuine issues to be determined at trial. The first issue is whether Wood, as president and major shareholder of WHW, had authority to accept terms of sale on behalf of WHW. If he did not, then WHW cannot be bound by Wood's acceptance of Abrams' terms. On the other hand, even if Wood lacked the authority to bind WHW, he would still remain bound personally to the terms of the listing agreement.

Wood's personal liability under the listing agreements is not dependent on his authority to bind WHW, the owner of the property, to terms of sale, or a conveyance. Under Idaho case law:

> [W]here a co-owner of realty expressly or impliedly represents to a real estate broker that he has authority to sell property subject to the agreement, he will be liable to the broker for a sales commission upon performance of the agreement by the broker despite the failure of any other co-owner or co-owners to sign the agreement.

*Rexburg Realty v. Compton,* 101 Idaho 466, 468, 616 P.2d 245, 247 (1980) (citing *Garfield v. Tindall,* 98 Idaho 841, 573 P.2d 966 (1978)). In *Rexburg Realty,* two of three co-owners, a husband and wife (Comptons), employed a real estate broker to procure a buyer ready and willing to purchase on terms to which the Comptons would agree. The Comptons represented to the broker that their acceptance of terms of sale would be sufficient to bind the remaining co-owner, Mr. Compton's mother (Bateman), because Bateman would go along with the Comptons' decision. The broker procured a buyer who negotiated terms of sale with the Comptons, and subsequently entered into a purchase agreement with the Comptons. However, when Bateman refused to consent to the sale, the transaction was not consummated. The broker then sued the Comptons for his commission, and the prospective buyer sued the Comptons for specific performance of the purchase agreement. The Supreme Court held that a real estate broker's employment contract is a service contract not necessarily related to the ownership of land, and that a brokerage agreement involving realty owned by multiple owners need only be signed and executed by one owner and is binding upon the signing owner even absent the other owners' signature or ratification of the agreement. While a co-owner may not have authority to convey title to the property without the signature of the other owners, when a co-owner enters a service contract with a real estate broker, the co-owner is personally liable on the contract, whether or not the other owners become party to or consent to the contract.

In this case Wood entered into a brokerage contract with Kepler, which contract provided that Kepler could complete performance by producing a buyer willing to purchase on terms acceptable to Wood. This contract is conclusive evidence that Wood represented he had authority to accept terms for the sale of the property. Kepler also presented evidence showing that Wood represented to McNeill that he had authority to sell the motels. Wood may not escape liability for the commissions or a breach of good faith under the Quality Inn brokerage contract by claiming that he did not have authority to sell the motels. Wood's ability to convey title to the motel is irrelevant to his personal liability on the service contracts he entered into with Kepler. Wood is personally bound by the terms of the listing agreements, and the only issue as to his liability under those agreements is: (1) whether the terms of sale proposed by Abrams, or Steinbock & Hofmann under the Westbank Motel listing agreement, were accepted or acceptable to Wood; and (2) whether Wood breached his duty to act in good faith under the agreements.

There remains a genuine issue, however, as to whether Wood had authority to bind WHW to terms of sale. The language of

the agreement states that Kepler could complete performance by procuring a buyer willing to purchase on "such ... terms and price as I may accept." Because Wood was the party entering the agreement on behalf of WHW, and the parties do not dispute that Wood had authority to do so, the obvious interpretation of this language is that the "I" referred to Wood, personally, and that Kepler had to produce a buyer willing to purchase on such terms as Wood may accept. If this provision of the listing agreement exceeded Wood's authority as president and major shareholder of WHW, then WHW would not be bound to terms accepted by Wood alone. If it was within Wood's authority, then WHW would be bound by Wood's acceptance of proposed terms of sale.

▉ This raises another issue to be determined at trial: whether Wood unconditionally accepted the terms proposed by Abrams when he signed the letter of intent. Resolution of this issue requires construction of Wood's signature and addendum on Abrams' letter of intent. The district court ruled that as a matter of law Wood's acceptance was conditioned by the addendum which Wood typed under his signature. Contrary to the ruling of the district court, we hold that the addendum typed by Wood is ambiguous, and its meaning is a question to be determined by the trier of fact. Whether a writing is ambiguous is a question of law. *Bennett v. Bliss*, 103 Idaho 358, 360, 647 P.2d 814, 816 (Ct. App.1982). Where the language of a contract is clear and unambiguous, the meaning of the contract and the intent of the parties must be determined from the plain meaning of the contract's own words. *Wood v. Simonson*, 108 Idaho 699, 702, 701 P.2d 319, 322 (Ct.App.1985); *Ryan v. Mountain States Helicopter, Inc.*, 107 Idaho 150, 153, 686 P.2d 95, 98 (Ct.App.1984). However, if the parties' intent cannot be understood by their written agreement, their intent is a question of fact to be determined at trial. *Jensen v. Westberg*, 109 Idaho 379, 381, 707 P.2d 490, 492 (Ct. App.1985).

The language of the addendum does not state that Wright would have to approve "this" agreement (the letter of intent), as respondents assert in their brief. Rather it states that Wright would have to sign "the" agreement. What "the" agreement is that is being conditioned upon Wright's approval is subject to either Wood's or McNeill's interpretation. Wood claims that the addendum made his signature of acceptance and approval of the terms proposed by Abrams conditional on Wright's approval as well. Kepler claims that Wood's acceptance of the terms proposed by Abrams was unconditional and that the purpose of Wood's addendum was only to document the fact that Wright, as the other major stockholder of WHW, would have to sign off on the final documents transferring title.

Kepler's interpretation is supported by various facts in the record. First, as mentioned above, the words "the agreement" in the addendum are ambiguous. Wood may have meant that Wright would need to approve the agreement reached by Wood and Abrams as to the terms of sale, thus conditioning Wood's acceptance of those terms on Wright's subsequent acceptance, as Wood asserts. On the other hand, Wood may have merely intended to inform Abrams that he could not ultimately transfer title to the property, as they were agreeing to do, without Wright's signature on the documents of transfer. Second, as discussed above, a straightforward reading of the listing agreement reveals that Kepler was required to procure a buyer willing to purchase on terms that "Wood" would accept. The contract does not contemplate that Wright would need to approve the terms of sale. Third, McNeill's affidavit states that Wood consistently held himself out as having authority to negotiate a sale without anyone else's approval. And finally, the fact that Wood actually accepted the terms of sale proposed by Abrams is consistent with Wood's conduct after signing the letter. Abrams' letter of intent stated that "[a]fter acceptance of this letter of intent your [McNeill's] office should draft a formal contract for the appropriate signatures." After Wood signed

Abrams' letter of intent, McNeill prepared a formal purchase contract entitled "RECEIPT AND AGREEMENT TO PURCHASE." This purchase contract contained essentially the same terms of sale as did Abrams' letter of intent. Wood signed the cover letter requesting that Abrams sign and return the purchase agreement. It seems inconsistent for Wood to claim that he did not accept the terms proposed by Abrams in his letter of intent, when he subsequently sent Abrams a purchase agreement containing those same terms of sale. However, this is only circumstantial and inconclusive evidence that Wood accepted Abrams' terms, since Wood never did sign the purchase agreement itself. Wood may have sent the purchase agreement to Abrams intending to obtain Wright's approval before signing it, after it had been signed and returned by Abrams.

Whether Wood actually accepted the terms of sale proposed by Abrams is a question of fact that we do not decide. Rather, we conclude that Kepler has presented sufficient facts to raise a genuine issue as to whether Wood accepted Abrams' terms of sale, thus making Wood liable for Kepler's commission. Further, if we assume that Wood did accept Abrams' terms, there is a genuine issue as to whether Wood was authorized to accept the terms on behalf of WHW, which would make WHW liable for the commission as well as Wood.

■ Based on the facts presented by Kepler and the law set forth in the previous section, there are genuine issues as to: (1) whether Wood breached the Quality Inn listing agreement by refusing to pay Kepler the promised commission after Kepler had procured a buyer ready and willing to enter into a deal for the price and terms stated in the listing agreement, and (2) whether Wood breached the Quality Inn brokerage contract by unreasonably refusing to negotiate with an interested buyer not yet ready and willing to purchase on terms acceptable to Wood, thus preventing Kepler's performance under the contract. Because these facts are disputed by the parties, and because they raise genuine

issues regarding Kepler's claim under the Quality Inn listing agreement, Wood was not entitled to summary judgment on that claim.

3. *Misrepresentation*

The district court ruled that Wood was entitled to summary judgment against Kepler's claim of fraudulent misrepresentation for two reasons: (1) Kepler had failed to plead the factual elements of fraud with particularity as required by I.R.C.P. 9(b); and (2) Kepler had failed to support its claim of fraud with any substantial evidence. Although, as explained below, we agree with the district court's conclusion that Kepler failed to properly allege an action for misrepresentation in its pleadings, we nevertheless hold that summary judgment against Kepler on this claim was improper.

■ To establish a claim of misrepresentation, Kepler had the burden of showing:

(1) a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that the representation will be acted upon in a reasonably contemplated manner; (6) the listener's ignorance of its falsity; (7) the listener's reliance on the truth of the representation; (8) the listener's right to rely on the truth of the representation; and (9) the listener's consequent and proximate injury.

*Galaxy Outdoor Advertising v. Idaho Transp. Dept.,* 109 Idaho 692, 696, 710 P.2d 602, 606 (1985). The party alleging fraud has the burden of proving each of these elements by clear and convincing evidence. *Smith v. King,* 100 Idaho 331, 334, 597 P.2d 217, 220 (1979).

I.R.C.P. 9(b) requires that in all averments of fraud the circumstances constituting fraud shall be stated with particularity. In stating its claim of misrepresentation, Kepler set forth the following facts and allegations:

Defendants falsely and fraudulently represented that they were owners in fee simple of the said property, and Defendant, Willard R. Wood, as agent for the

other Defendants here, falsely and fraudulently represented that he had authority to bind WHW, Inc. and the other Defendants herein, knowing that there were other ownership interests in the said real and personal property and knowing that Defendant, Willard R. Wood's authority to bind all Defendants might be limited.

. . . .

By reason of the fraudulent misrepresentations of Defendants, Plaintiffs have been damaged in out-of-pocket expenses reasonably incurred in performing their obligations under the said contract or in reliance on the said contract, all in amounts to be proven hereafter.

The claim alleges two fraudulent representations: (1) that Defendants falsely and fraudulently represented that they were owners in fee simple of the property, and (2) that Wood falsely and fraudulently represented that he had authority to bind WHW Management, Inc. and the other Defendants. For the following reasons we conclude that these allegations, as a matter of law, are insufficient to maintain an action for misrepresentation.

Kepler's first allegation of fraud, based on defendants' representation that they owned the motels, cannot be the basis for a claim of misrepresentation, inasmuch as the parties all agree that the defendants did own the motels. An essential element of misrepresentation is that the representation made was false.

Kepler's second allegation of fraud, that Wood represented he had authority to bind the other defendants, is more difficult to analyze because Kepler does not specify what authority Wood misrepresented: his authority to enter the listing agreements, or his authority to convey title to the properties. In either case, however, an action for fraud is unfounded. In the first case, it is undisputed that Wood had authority to enter the real estate employment contracts on behalf of the defendants, therefore, Wood's representation of authority to that effect cannot form the basis of an action in fraud.

However, the parties do dispute Wood's representations as to his authority to actually convey title to the property listed in the employment contracts. Kepler claims Wood represented that he had complete authority to sell the motels without approval of the other owners. Wood denies he made such representations, and attempts to avoid liability under the employment contracts on the grounds that he lacked the authority or ability to contract for the sale of the properties. As discussed above, this defense to Kepler's action on the employment contracts is misplaced, inasmuch as Wood's liability on the employment contracts, which were essentially contracts for services, is not dependent on, or related to, his ability to actually convey title to the property listed in those contracts. *Rexburg Realty*, 101 Idaho at 467–68, 616 P.2d at 246–47; *Garfield*, 98 Idaho at 843, 573 P.2d at 968; *C. Forsman Real Estate*, 97 Idaho at 516, 547 P.2d at 1121. If Kepler performed its obligations under the employment contracts, it is entitled to Wood's performance—payment of the commissions—regardless of whether Wood actually did, or had the ability to, convey title to the properties.

To sustain its action in fraud, Kepler must show that Wood falsely represented his authority; that the fact of authority was material; that Kepler justifiably relied on that fact; that Wood intended that Kepler act upon the misrepresentation of his authority; and that Kepler did, in fact, act in reliance on Wood's misrepresentation, which reliance was the proximate cause of harm to Kepler. Based on this analysis, and the facts pleaded by Kepler, we conclude that, as a matter of law, Kepler cannot sustain a cause of action for fraud. Wood may have falsely represented his authority to sell the properties to Kepler. And, undoubtedly, Wood's authority to sell would have been material to Kepler's decision to enter into the employment contracts with Wood. However, even if we assume that Kepler was justified in relying on Wood's representation of authority,[2] Ke-

2. The district court held that even if Wood did     misrepresent that he had authority to sell the

pler cannot claim it was harmed by Wood's misrepresented authority. This is because, as stated above, whether Wood had authority to sell the motels does not affect Kepler's rights under the employment contracts. Even if Wood had no authority to sell the motels, he would still be liable to Kepler under the listing agreements if Kepler had completed performance. The listing agreements did not require a sale of the property before Kepler was entitled to its commission, only that Kepler present a ready and willing buyer. Kepler could fully perform regardless of Wood's ability to convey the properties. Therefore, Kepler has failed to raise a genuine issue as to whether it was harmed by the misrepresentations alleged in its complaint.

■ Although the allegations of Kepler's complaint are insufficient to maintain a cause of action for misrepresentation, we nevertheless conclude that the district court erred in granting Wood's motion for summary judgment on this claim. A motion for summary judgment is to be granted only if a review of the pleadings, depositions, admissions, and affidavits of the parties shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. While the factual allegations contained in Kepler's pleadings do not constitute an actionable fraud, the facts set forth in Kepler's affidavits do raise a genuine issue as to whether Wood committed a fraudulent misrepresentation which proximately harmed Kepler. Both the Westbank Motel and the Quality Inn listing agreements constitute promises on the part of Wood to negotiate in good faith with interested buyers for the sale of the listed properties. If, at the time these promises were made, Wood did in fact intend to negotiate with prospective buyers for the sale of the properties, the fact that he subsequently broke his promise could not create a cause of action for fraud, but merely an action for breach of contract. If, however, at the time of contracting, Wood had no intention of performing the contract, Wood has mis-

represented a material fact; his present intention. "All but a few courts regard a misstatement of a present intention as a misrepresentation of a material fact; and a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit, or for restitution or other equitable relief." W. Prosser & W. Keeton, PROSSER AND KEETON ON THE LAW OF TORTS, § 109, pp. 762–65 (5th ed. 1984). Idaho follows this rule. *Pocatello Security Trust Co. v. Henry*, 35 Idaho 321, 328–29, 206 P. 175, 177 (1922); *see also Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 216 Cal.Rptr. 130, 702 P.2d 212 (1985); *Von Hake v. Thomas*, 705 P.2d 766 (Utah 1985); and *Mountain Fir Lumber Co. v. Employee Benefits Ins.*, 64 Or.App. 312, 667 P.2d 567 (1983), *rev'd on other grounds*, 296 Or. 639, 679 P.2d 296.

■ In order to prove fraudulent misrepresentation of intent to perform a contract, the claimant must prove by clear and convincing evidence that at the time of making the promise, the promisor had no intent to perform the promise. While a mere breach of a contract or promise is never enough in itself to establish the fraudulent intent, that intent may be inferred from circumstantial evidence. The facts presented in the affidavits submitted by Kepler, when viewed in a light favorable to Kepler, show: that Wood entered into a listing agreement with Kepler to have Kepler procure a buyer ready and willing to purchase on terms acceptable to Wood; that Wood entered into negotiations with prospective buyers procured by Kepler; that when the purchase price of the property and the terms of sale had been substantially negotiated by the parties, Wood withdrew from negotiations without explanation even though the prospective buyers remained interested and desired to negotiate further; and that Wood agreed to sell one of the properties to his son on terms which were similar or equivalent to terms which had been acceptable to a prospective buyer procured by Kepler. We conclude

property, as a matter of law Kepler was not entitled to rely on that representation because at all times Kepler knew there were others who

had major ownership interests in the property. The justifiability of a party's reliance is an essential element to a claim of fraud.

that these facts raise a genuine issue as to whether Wood, at the time he entered the listing agreements, intended to negotiate in good faith the sale of the listed properties.

We note that although the facts constituting fraud are not set forth in Kepler's pleadings, Wood is not entitled to judgment as a matter of law on this claim. This action is still in the pretrial phase, and Wood has not moved the court to dismiss Kepler's misrepresentation claim on the pleadings, but has moved for summary judgment, which is based not only on the pleadings, but on the depositions, admissions, and affidavits of the parties as well. On remand, Kepler may move the district court under I.R.C.P. 15 for leave to amend its pleadings to allege with particularity the circumstances constituting fraud, as required by I.R.C.P. 9(b).

4. *Specific Performance of Purchase Agreement*

Plaintiff Abrams claims that he is entitled to specific performance on the grounds that he entered into a purchase money agreement with WHW, through its agent Wood, for the purchase and sale of the Quality Inn. Abrams asserts that when Wood signed the February 4, 1987, letter of intent, the purchase agreement was executed, and therefore he is entitled to specific performance of that agreement.

Our Supreme Court has held that specific performance is not an appropriate remedy for breach of an earnest money agreement when the earnest money agreement is incomplete and not the final statement of the terms of conveyance. *Luke v. Conrad,* 96 Idaho 221, 222, 526 P.2d 181, 182 (1974). In the present case, the letter of intent constituting the alleged contract for sale was not intended by either of the parties to be a complete and final statement of the terms of conveyance. The letter of intent expressly contemplates that the parties would draft a formal contract after this letter was accepted. The formal contract drafted by McNeill and signed by Wood did vary slightly in its terms from the letter of intent. The cover letter accompanying the formal contract recognized that financing

terms and arrangements had yet to be made. If Wood's addendum to Abrams' letter of intent is construed as Abrams and the other plaintiffs contend, then clearly Wood was anticipating a final agreement in the future to be signed by all of the parties, including Wright. The facts show that the parties continued to negotiate the terms of sale after the letter of intent was signed by the parties. Because the document claimed by Abrams to be a purchase contract was not a complete and final statement of the terms of conveyance, it will not be specifically enforced as a matter of law. Therefore the district court correctly granted summary judgment in favor of defendants on this claim.

## IV. CONCLUSION

We hold that the district court erred in granting the defendants' motion for summary judgment as to Kepler's claims for: (1) breach of the Westbank Motel listing agreement, (2) breach of the Quality Inn listing agreement, and (3) misrepresentation by Wood. We hold that the district court did not err in granting summary judgment to defendants on Abrams' claim for specific performance of an alleged purchase agreement. Further, because defendants should not have been the prevailing parties below, the district court's award of attorney fees to defendants was improper. For the foregoing reasons, the judgment of the district court is reversed except as to Abrams' claim for specific performance. The case is remanded for further proceedings. No attorney fees on appeal. Costs to Kepler on its appeal; costs to WHW and Wood on Abrams' appeal. I.A.R. 40 and 41.

WALTERS, C.J., and SWANSTROM, J., concur.